### TRI–COUNTY BUSINESS CAMPUS JOINT VENTURE

v.

### CLOW CORPORATION.

Civ. A. No. 90–5845.

United States District Court, E.D. Pennsylvania.

May 8, 1992.

Paul W. Callahan, Fox, Differ, Callahan, Ulrich & O'Hara, Norristown, Pa., for plaintiff-petitioner.

Frank M. Thomas, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant-respondent.

## MEMORANDUM

BARTLE, District Judge.

This is an environmental action which the Tri–County Business Campus Joint Venture ("Tri–County") has brought against the Clow Corporation ("Clow"). Tri–County seeks recovery of more than $1.7 million for testing, investigating and removing allegedly hazardous substances from an 85 acre tract in Pottstown Borough, Pennsylvania, which it acquired from Clow in 1985.[1]

Tri–County acquired the land for purposes of commercial and industrial development. Only after the acquisition did Tri–County learn that substantial amounts of waste were buried on the site. Tri–County believed that these materials were buried or located on the property during the period of Clow's actual or constructive ownership.

---

1. Clow became the owner of the subject premises in 1971 by way of a merger with Robinson Clay Products ("Robinson"). Robinson, a manufacturer of clay pipe and certain related products including Wedge–Lock–O pipe joint seal, owned the property from August of 1940 until the merger. In 1985 the property was conveyed by Clow to Charles C. Gueli, as straw party for Tri–County.

On January 27, 1989, the Pennsylvania Department of Environmental Resources ("DER") issued a violation notice to Tri–County. The notice required Tri–County promptly to submit to DER a proposal for "drum sampling, interim storage and disposal," as well as a proposal "for handling drums or contamination discovered in the future." According to plaintiff the subsequent analysis of samples from the property revealed the existence of (1) hazardous waste substances as defined by the Pennsylvania Solid Waste Management Act, ("SWMA"), 35 Pa.Stat.Ann. § 6018.101 *et seq.;* and (2) hazardous wastes as defined by both the Comprehensive Environmental Responses, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (collectively "CERCLA"), 42 U.S.C. § 9601 *et seq.,* and the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. Stat.Ann. 6020.101 et seq. Thereafter, on May 23, 1989, DER entered an order and civil assessment penalty which required Tri–County to submit a plan to remove, as well as to remove, the drums and associated waste on the property.

Ultimately, 450 resin-containing drums, parts, buckets and barrels of liquid and semi-solid wastes were evacuated from the property, as well as many resin filled hoses and resin blocks and gaskets. Plaintiff Tri–County maintains that hazardous wastes were removed from the property, thereby entitling it to the recovery of substantial clean-up costs. Defendant Clow, however, argues that liability does not exist under CERCLA or HSCA because the clean-up costs were solely as a result of violations of the non-hazardous substance provisions of the SWMA.

Plaintiff's initial complaint against Clow contained ten counts: Liability under CERCLA (Count I); Declaratory Relief under CERCLA (Count II); Declaratory relief under HSCA (Count III); Negligence *per se* in violating statutory requirements (Count IV); Misrepresentation (Count V); Negligent Misrepresentation (Count VI); Innocent Misrepresentation (Count VII); Strict Liability in engaging in abnormally dangerous behavior (Count VIII); a Claim for Contribution under CERCLA (Count IX); and a Claim for Indemnification (Count X). Subsequently, based on new authority recognizing a private right of action under the HSCA, plaintiff filed an uncontested motion to amend its complaint to add, as Count XI, Liability under HSCA. On August 14, 1991, Judge Franklin S. Van Antwerpen of this Court allowed the amendment.

Four pre-trial motions are now before this Court for decision. Defendant Clow has moved for summary judgment on all eleven counts of plaintiff's Amended Complaint, while plaintiff has moved for summary judgment only on Counts I and XI which involve liability for response costs under CERCLA and HSCA. Additionally, plaintiff has moved to strike defendant's jury trial request, and defendant has moved to depose plaintiff's expert. For the reasons set forth below, these motions will be granted in part and denied in part.

■ The standards for deciding summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure are well settled. To obtain summary judgment the moving party must establish that no genuine issues of material fact remain in dispute. *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party. A factual dispute is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 248, 106 S.Ct. 2505, 2511, 2510, 91 L.Ed.2d 202 (1986). In deciding whether the summary judgment standard has been met, the evidence must be viewed in the light most favorable to the non-moving party. *Mellon Bank Corp. and Mellon Bank, N.A. v. First Union Real Estate Equity and Mortgage Investments,* 951 F.2d 1399, 1404 (3d Cir.1991).

Tri–County alleges in Counts I, II and IX that Clow has violated CERCLA because of a release or threatened release of CERCLA hazardous substances from the property.

It further contends that it has met all of the statutory prerequisites for recovery from Clow.

▌ In order to recover from Clow under CERCLA, Tri–County must establish (1) that the property involved is a "facility" (42 U.S.C. § 9601(9)); (2) that Clow is a responsible person (42 U.S.C. § 9607(a)(2)); (3) that the substances in question are hazardous substances under CERCLA (42 U.S.C. §§ 9601(14), 9602(a); 40 C.F.R. Table 302.4 (1991)); (4) that "there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" (42 U.S.C. § 9607(a)(4)); and (5) that the response costs, which are incurred by way of removal or remedial actions (42 U.S.C. § 9601(23), (24), (25)), were necessary and consistent with the governing National Contingency Plan ("NCP") (42 U.S.C. § 9607(a)). *See, e.g., B.F. Goodrich Company v. Murtha,* 754 F.Supp. 960 (D.Conn. 1991); *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1239 (M.D.Pa.1990). For the purpose of the motions before the Court, there is no dispute that the property involved is a "facility" and that Clow is a responsible person under the statute.

▌ According to defendant Clow, however, Tri–County erroneously maintains that "liability under CERCLA is triggered by the mere presence of trace quantities of allegedly hazardous constituents in materials which are not, in and of themselves, listed as 'hazardous substances' under CERCLA." Clow further argues (1) that Tri–County has not shown that the materials found at the site would release their hazardous constituent ingredients under the conditions at the site; (2) that Tri–County has not shown that there was a release or a threatened release which caused the incurrence of response costs; and (3) that Tri–County failed to comply with the applicable National Contingency Plan ("NCP"). Hence, Clow claims entitlement to summary judgment on the CERCLA claims in Counts I, II and IX of the Amended Complaint.

A review of the record conclusively establishes that substantial and genuine issues of material fact exist with respect to the CERCLA claims. *See* Fed.R.Civ.P. 56. Contrary to the position taken by Clow, Tri–County's version of the facts establishes that more than mere trace elements of hazardous constituents are at issue. Evidence exists which would support, but which would not require, a finding that a release or threatened release of a hazardous substance occurred which caused the incurrence of response costs.

Tri–County supplied affidavits from site excavator Robert L. Bealer, from geologists Robert S. Terefenko and William Randall, and from consultant James Smith. According to these affidavits (1) volatile vapors and strong odors of styrene emanated from materials which were excavated from the site, from drums found on the site when those drums were crushed, and from certain hard substances found on the site when these substances were broken open; (2) the plastisol found on the property, which is a mixture of polyvinylchloride ("PVC") and other chemicals, is different from the plastisol considered in *United States v. New Castle County,* 769 F.Supp. 591 (D.Del.1991), because no chemical reaction is necessary to cause the hazardous plasticizers to disassociate from the PVC; (3) phthalates and polychlorinated biphenyls ("PCBs") were present in the site soil; (4) soil samples indicate a release of styrene and dimethylaniline on the site; and (5) no chemical reaction is necessary to cause a disassociation of the hazardous components of the Wedge–Lock–O mixture which was found in the site soil.[2]

---

2. If deemed credible, this evidence would establish the presence on the site of one or more CERCLA hazardous substances. The affidavits themselves talk about the presence of "hazardous plasticizers" and "hazardous components" in the Wedge–Lock–O mixture found. Further, the term "hazardous substance" under CERCLA is defined by 42 U.S.C. § 9601(14).

... [It] means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of

Clow's consulting expert, David E. Gallis, takes exception to much of the evidence and to many of the conclusions set forth in the affidavits provided by plaintiff. He maintains, for example, that the plastisol material in question was heat cured

> so that the constituents in the original plastisol material will be stabilized (*i.e.*, the constituents are not available for release into soils or surface or ground waters *under normal environmental conditions*). Indeed, the express purpose for using heat cured plastisol is to seal the clay pipe joints so that the joints resist and repel water. Leaching of constituents from those water-resistant materials *is not a probable event.*

(emphasis added). He also disputes Dr. Smith's assertion that there was a release of styrene or dimethylaniline onto the property from the Wedge–Lock–O in its pre- or post-polymerized state. Finally, after asserting that styrene was not detected at eight (8) of nine (9) locations which were tested, Dr. Gallis acknowledges that, as to the ninth location, "styrene was reported present in the low parts per billion (ppb) range." It is his position, however, that

> [t]his single reported detection of styrene at a level slightly above the method quantitation limit does not establish that Wedge–Lock–O released monomeric styrene into the environment. The contrast in semivolatile analysis results for NS–5 and ND–5 *strongly suggests* that a solid

polystyrene material was present in the soil that was analyzed.

(emphasis added).

Thus, contrasting Dr. Gallis' report and analysis on behalf of defendant Clow with the affidavits provided by Tri–County unquestionably establishes that genuine issues of material fact exist on the question of whether any release or threatened release of CERCLA hazardous substances occurred. *United States v. New Castle, supra,* and *United States v. Serafini,* 750 F.Supp. 168 (M.D.Pa.1990), the summary judgment cases upon which defendant Clow relies to establish that no such release or threatened release occurred, are factually inapposite. In *New Castle,* as here, a CERCLA hazardous substance was a constituent of a discarded material, and the pertinent question for decision was whether the discarded "waste is capable of generating or releasing a hazardous substance at the site." Summary judgment was warranted there only because no evidence was produced to rebut the third-party defendant's expert opinion evidence that the unreacted hazardous substance would not disassociate at the site. Here, of course, such rebuttal evidence is presented in Dr. Smith's affidavit.[3]

Similarly, Dr. Smith's affidavit establishes *Serafini's* inapplicability to the case at bar. *Serafini* held that if a chemical reaction—there a burning—is required to cause

---

which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15....

40 C.F.R. Table 302.4 (1991), which designates CERCLA hazardous substances pursuant to § 9602 (§ 102 of CERCLA), identifies at least the following as hazardous substances: styrene (Chemical Abstract Service Registry Number ("CASRN") 100425), PCBs (seven (7) categories, primary CASRN 1336363). In addition, Dr. Smith's report, which is supported by affidavit, states that methy ethyl ketone and lead (Pb), which are listed as hazardous substances in Table 302.4, were found at the site. Finally, phthalate esters are listed as a toxic air pollu-

tant in the list promulgated pursuant to the Clean Air Act at 42 U.S.C. § 7412(b), as referenced in § 9601(14).

Significantly, a material that is not a hazardous waste under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.,* may nevertheless be a CERCLA hazardous substance. Further, CERCLA does not impose any quantitative requirement as to what constitutes a hazardous substance. *Arizona v. Motorola, Inc.,* 774 F.Supp. 566, 571 (D.Ariz.1991).

**3.** *New Castle* is not only factually inapposite, its rationale has been questioned. In *New York v. Exxon Corporation,* 766 F.Supp. 177, 184–185 (S.D.N.Y.1991), the court rejected the notion that a plaintiff had to prove a hazardous substance is capable of leaching out of a waste in order to demonstrate a release, holding instead that the mere presence of a listed hazardous substance in a defendant's waste is sufficient.

a non-hazardous substance to generate the release of a hazardous substance, the plaintiff must establ'.h the likelihood that such a reaction could occur. Dr. Smith's affidavit in this case, however, maintains that a chemical reaction is not a necessary prerequisite for the disassociation of Wedge–Lock–O hazardous components. Thus, Tri–County is not required to meet the burden which was imposed by the *Serafini* court.

Although plaintiff's motion for summary judgment as to Count I must be denied because there are genuine issues of material fact about the release or threatened release of CERCLA hazardous substances, it nevertheless remains for this Court to consider whether the costs incurred by Tri–County, which are the subject of this litigation, were incurred in a manner consistent with the applicable NCP (National Contingency Plan).[4] If those costs were not so incurred, Clow would be entitled to summary judgment as to plaintiff's CERCLA claims set forth in Counts I, II and IX of the Amended Complaint.

■ Resolution of the questions relating to plaintiff's incurrence of costs requires the Court first to decide whether the 1985 NCP (40 C.F.R. Part 300 (1988)) or the 1990 NCP (40 C.F.R. Part 300 (1990)) applies in this case. Additionally, it requires the Court to consider whether Tri–County must strictly or substantially comply with whichever plan is applicable, and whether Tri–County engaged in a removal or a remedial action.

The 1990 NCP was issued on March 8, 1990, and became effective on April 9, 1990. *County Line Invest. Co. v. Tinney,* 933 F.2d 1508, n. 5 at 1511 (10th Cir.1991). It states in its Preamble "that the new definition of 'consistency with the NCP' *does apply* to clean-ups that are already underway as of the effective date." *Ambrogi v. Gould,* 750 F.Supp. 1233, n. 27 at 1254 (emphasis added) (M.D.Pa.1990). Thus, if Tri–County's clean-up was "under-

way" on April 9, 1990, the 1990 NCP is the applicable plan.

Defendant Clow maintains that the 1985 plan, and not the more lenient revised 1990 plan, is applicable. It bases its position entirely on the deposition testimony of Robert W. Campbell that site remediation was completed in January of 1990 "to Tri–County's mind."

Clow fails, however, to take into account the following additional testimony of Mr. Campbell:

Q. You testified earlier that the remediation was completed as of January of 1990. Has—

A. I testified to that simply because when I left in January of 1990 I—as I recall, the hazardous—some of the hazardous material was still to be taken away. I don't know whether it was on site or it was stored somewhere by SMC, but it had not been disposed of yet. And the DER had not issued yet that so-called negative declaration.

It also ignores the documentary evidence provided by Tri–County in Exhibit K which demonstrates that expenses were continuing to be incurred by Tri–County during the following billing periods: "02/18/90 to 04/13/90," "04/14/90 to 05/12/90," "05/13/90 to 05/26/90," and "05/27/90."

The question of the applicability of the 1990 plan, to a case in which a clean-up was underway at the time of the plan's effective date, was considered and resolved in favor of the applicability of the 1990 plan by Judge Van Antwerpen of this Court in *Con–Tech Sales v. Cockerham,* Civil Action No. 87–5137 (E.D.Pa.1991) (1991 WL 209791, 1991 U.S.Dist.LEXIS 14624). Based on that well reasoned opinion, and because costs were incurred in this case after the 1990 plan's effective date, this Court holds that the 1990 NCP is applicable to the case at bar "at least to the extent that the new version does not impose new

---

**4.** The existence of genuine issues of material fact with respect to whether there was a release or threatened release of hazardous substances necessarily obviates the need for this Court now to consider whether there was "a release or threatened release which cause[d] the incur-

rence of response costs." *See* 42 U.S.C. § 9607(a)(4). Such a determination need not be made unless and until the fact finder determines that "a release or threatened release" occurred.

and more onerous requirements on private parties seeking recovery." *Ibid.*, slip op. at 5.

█ Private parties like Tri–County may recover "necessary costs of response" under CERCLA only if those costs are "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Regardless of whether the 1985 NCP or the 1990 NCP applies, consistency is an element of the plaintiff's *prima facie* case, and the plaintiff bears the burden of proving that its response costs were consistent with the applicable plan. *See, e.g. Con–Tech Sales v. Cockerham, supra,* slip op. at 5; *Philadelphia v. Stepan Chemical Co. et al.,* 748 F.Supp. 283, 286 (E.D.Pa.1990).

█ Under the prior 1985 NCP, the weight of authority was to the effect that parties seeking response costs had to establish strict compliance with the plan. *E.g. Channel Master Satellite, Systems, Inc. v. JFD Electronics Corp.,* 748 F.Supp. 373, 383 (E.D.N.C.1990). The standard to be met under the 1990 plan, however, is far more lenient. It is necessary now only to establish substantial compliance with the plan. *E.g. Con–Tech Sales v. Cockerham, supra,* slip op. at 5. "The new regulations expressly require lenience in their application and state that inconsistency should not be found on 'immaterial or insubstantial deviations from the provisions of 40 C.F.R. part 300.'" *Ambrogi v. Gould, Inc., supra,* n. 27 at 1254.

EPA believes that "consistency with the NCP" should be measured by whether the private party cleanup has, when evaluated as a whole, achieved "substantial compliance" with the potentially applicable requirements, and resulted in a CERCLA-quality cleanup.

55 Fed.Reg. 8793 (March 8, 1990).

In order properly to rule on defendant's summary judgment motion, which is predicated on the premise that Tri–County did not act consistently with the NCP, the applicable provisions of the governing 1990 plan must be identified. This, in turn, requires a determination as to whether the clean-up which was undertaken was a remediation or a removal. Tri–County characterizes their actions as a removal; Clow maintains that the clean-up was a remediation.

Remedial actions are subject to the more stringent requirements of the 1990 plan as set forth in 40 C.F.R. §§ 300.420, 300.425, 300.430 and 300.435, while removals are subject to the less stringent requirements at 40 C.F.R. §§ 300.410 and 300.415. The terms "remove," "removal," "remedy," and "remedial action" are defined in 42 U.S.C. § 9601(23) and (24).[5]

█ Generally speaking, a removal is a short-term limited response to a more manageable problem, while a remedial action involves a longer term, more permanent and expensive solution to a more complex problem. *See Ambrogi v. Gould, Inc., supra* at 1240. The delineation between removal and remedial actions, however, is not absolute. "The mere fact ... that what would otherwise be a removal action effects a permanent remedy does not convert that action into a remedial action." *BCW Associates, Ltd. et al. v. Occidental Chemical Corp. et al.,* Civil Action No. 86–5947 (E.D.Pa.1988) (1988 WL 102641, 1988 U.S.Dist.LEXIS 11275) at pg. 21. Like-

---

**5.** § 9601(23) provides, in part, as follows:

The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [footnote omitted] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release....

§ 9601(24) provides, in part, as follows:

The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent, or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment....

wise, while excavation, which was here employed, is more frequently associated with remedial actions, excavation has also been characterized as a removal in circumstances similar to the case at bar. *See General Electric Co. v. Litton Industries Automation Systems, Inc.,* 920 F.2d 1415, 1419 (8th Cir.1990).

Tri–County's own description of its cleanup efforts is a prime starting point for determining whether those efforts should be labelled as remedial or removal under the statute. According to Tri–County a small quantity of buried barrels was first unearthed in 1985 and 1986 and disposed of at the Pottstown Landfill. In early 1988, however, additional barrels were excavated. They were stockpiled at one location and later moved to a second location where they were "bermed." DER subsequently conducted an investigation and issued its previously described January 27, 1989 notice of violation. Thereafter, on May 23, 1989, DER directed Tri–County to remove the stored drums and their contents from the property and to submit a plan for removing all drums and other waste from the site.

A meeting was held with DER on May 30, 1989, which was also attended by SMC Environmental Services Group ("SMC"), an environmental engineering group retained by Tri–County "to complete the investigation, site evaluation, barrel and waste removal and final assessment." At that meeting Tri–County agreed to submit a work plan for the sampling, testing and disposing of the site waste "with which DER was concerned."

With respect to its ultimate course of action—completely removing drums, resin blocks, gaskets, resin filled hoses and other waste materials, as well as various amounts of soil from the site—Tri–County stated:

> DER made it clear that the waste material had to be removed from the site and SMC designed the work plan for a removal action. At various times, SMC and Tri–County considered the option of leaving the material on the site. That option, however, would have required testing the materials, performing a detailed analysis to determine the health and safety risks to people eventually inhabiting buildings on the site, amending the work plan, capping and stabilizing the fill material, monitoring the groundwater and inserting deed restrictions on the sale of any lots. And Tri–County would still have been required to fully excavate the site to identify all the waste, its concentration and quantity. Alternatives to removal invariably came up and the discussion always concluded with the decision to continue with removing the waste from the site.

(record citations omitted).[6] Accordingly, various materials—including the majority of the drums—were taken to a West Virginia landfill. Other categories of waste were disposed of differently. By way of illustration, liquid and semi-liquid substances found on the site in buckets, drums and bottles were "overpacked" on the site and eventually disposed of by outside firms.

Tri–County relies primarily upon *Con–Tech Sales v. Cockerham, supra,* and *General Electric v. Litton, supra,* in support of its position that its actions can only

---

6. Tri-County's explanations concerning the removal of soil from the site is illustrative of the company's thought processes. During the course of excavation an orange paste, which gave off strong odors, was found in the soil. Such stained soil was put

> ... on the spoils pile. In developing the sorting/separation protocol, SMC had assumed there was a certain amount of spillage or leakage from the waste material into the area immediately surrounding it. That assumption proved accurate, as the material around the waste was visually discolored. SMC had also reviewed prior soil samples indicating

the presence of contaminants in the soil around the waste. Moreover, in many cases, the waste was so prevalent in an excavation bucket that it would not have been feasible to sort through it by hand. For example, in some sections of the North Side, the excavators uncovered pockets of orange flakes present throughout the soil. Sorting through the bucket to remove each flake and then sampling and testing the soil for contamination would not have been feasible. It would have taken a trained person an hour just to sort through one bucket.

(record citations and footnotes omitted).

legitimately be characterized as a removal. It maintains, based on these cases, that it is immaterial that the "removal took over a year and was designed as a permanent, rather than temporary, measure." Clow, on the other hand, argues in its brief that Tri–County's clean-up was remedial because:

A clean-up is treated as remedial action where:

(a) it was designed to establish a "long-term and permanent strategy", *Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. [1563] at 1577 [ (E.D.Pa.1988) ];

(b) the action took more than twelve months and cost in excess of $1 million, *BCW Associates, Ltd. v. Occidental Chemical Corp.*, [Civil Action No. 86–5947 (E.D.Pa.1988) (1988 WL 102641, 1988 U.S.Dist.LEXIS 11275) ] slip op. at 19;

(c) there was ... no imminent release or threatened release of any hazardous substance, *Id.;* and

(d) the situation did not pose an urgent or immediate risk, *Channel Master Satellite v. JFD Electronics Corp.*, 748 F.Supp. at 385. An analysis of Tri–County's actions in light of the foregoing standards demonstrates that the actions undertaken by Tri–County are most appropriately characterized as remedial in nature.

The contrasting arguments asserted by the parties, which are predicated in part on the existence of factual disputes, conclusively establish that substantial and genuine issues of material fact exist on the question of whether Tri–County's clean-up should be characterized as a removal or a remediation.[7] Tests for making such a determination are, of course, set forth by CERCLA and the regulations promulgated thereunder. However, as Judge Cahn of this Court noted in *BCW Associates, Ltd., supra,* concerning plaintiff's clean-up actions:

None of these tests, taken alone, adequately characterize a response action as a removal or a remedial action. The better approach is to view the action taken by the plaintiffs in light of several factors: the cost, complexity, and duration of the clean-up; the immediacy of the release or threatened release; and the nature of the action taken.

*BCW Associates, Ltd., supra,* slip op. at 22.

Judge Van Antwerpen, when required in the summary judgment context to characterize a plaintiff's clean-up actions, stated, "[t]he parties are not in agreement about the facts surrounding these [clean-up] actions, and since the characterization of a response requires findings as to many of these disputed facts, we cannot now decide whether the steps taken were removal or remedial responses." *Con–Tech Sales v. Cockerham, supra,* slip op. at 9. The identical situation is presented here. Hence, the question of whether Tri–County's actions should be labelled as remedial or removal is not now ripe for decision on summary judgment.

Because the Court cannot at this point determine the character of Tri–County's clean-up actions, defendant's request for summary judgment as to plaintiff's CERCLA claims must be denied unless the evidence, viewed in the light most favorable to plaintiff, establishes that plaintiff failed substantially to comply with even the less stringent removal requirements of the liberalized 1990 NCP. Based on the present record, however, the Court cannot make such a determination because of the existence of genuine issues of material fact. Summary judgment, therefore, will not be granted as to any pending CERCLA claim.

■ Summary judgment is also sought by the parties with respect to the pending HSCA (Pennsylvania Hazardous Sites Cleanup Act) claims. As under CERCLA, a responsible person is strictly liable for specified response costs and damages

---

**7.** Substantial factual disputes exist, for example, as to whether there was an imminent release or threatened release of any hazardous substance and as to whether the situation presented on the site posed an urgent or immediate risk.

which result from the release or threatened release of a hazardous substance.[8]

Plaintiff Tri–County requests summary judgment as to Count XI of the Amended Complaint which pertains to HSCA response costs. Tri–County argues (1) that a private cause of action for response costs exists under HSCA; and (2) that the evidence viewed in the light most favorable to defendant Clow establishes HSCA liability on the part of Clow. Defendant Clow likewise seeks summary judgment as to Count XI, as well as Count III in which plaintiff seeks a declaratory judgment under HSCA. It maintains, however, (1) that no private cause of action exists under HSCA; (2) that the materials at issue are not hazardous under either HSCA or the SWMA; and (3) that declaratory relief is unwarranted because the site has been adequately remedied and it has not been shown that future contamination will occur.

■ The initial question is whether there exists a private cause of action for response costs under HSCA. Although the courts considering this question have been almost equally divided, this Court is persuaded that the better reasoned view is that set forth by Judge Conoboy in *Toole v. Gould, Inc.*, 764 F.Supp. 985 (M.D.Pa. 1991), who held that such a cause of action exists. This Court adopts that well reasoned opinion. *See also General Electric Environmental Services, Inc. v. Envirotech Corp.*, 763 F.Supp. 113 (M.D.Pa.1991).

■ It remains, therefore, to decide if plaintiff Tri–County has sufficiently established HSCA liability so as to entitle it to the entry of summary judgment. As is the case with respect to the CERCLA claims which have already been considered, a pivotal issue pertaining to HSCA liability is whether there was a release or threatened release of a hazardous substance. *See* 35 Pa.Stat.Ann. § 6020.702.

It has already been demonstrated that genuine issues of material fact exist in the CERCLA context with respect to the question of whether a release or threatened release of any hazardous substance occurred. Insofar as hazardous substances for purposes of HSCA include CERCLA hazardous substances (*see* 35 Pa.Stat.Ann. § 6020.103 defining "hazardous substance"), such genuine issues of material fact also exist in the HSCA context.[9] Ac-

**8.** Section 702 of HSCA, which defines the scope of liability, provides in pertinent part:

(a) General rule.—A person who is responsible for release or threatened release of a hazardous substance from a site as specified in section 701 is strictly liable for the following response costs and damages which result from the release or threatened release or to which the release or threatened release significantly contributes:

(1) Costs of interim response which are reasonable in light of the information available to the department at the time the interim response action was taken.

(2) Reasonable and necessary or appropriate costs of remedial response incurred by the United States, the Commonwealth or a political subdivision.

(3) Other reasonable and necessary or appropriate costs of response incurred by any other person.

(4) Damages for injury to, destruction of or loss of natural resources within this Commonwealth or belonging to, managed by, controlled by or appertaining to the United States, the Commonwealth or a political subdivision. This paragraph includes the reasonable costs of assessing injury, destruction or loss resulting from such a release.

(5) The cost of a health assessment or health effects study.

(35 Pa.Stat.Ann. § 6020.702). Section 701 of the Act (35 Pa.Stat.Ann. § 6020.701) defines who is responsible person under the Act.

**9.** Section 103 of HSCA defines hazardous substance in pertinent part as follows:

(1) Any element, compound or material which is:

(i) Designated as a hazardous waste under the act of July 7, 1980 (P.L. 380, No. 97), known as the Solid Waste Management Act, and the regulations promulgated thereto.

(ii) *Defined or designated as a hazardous substance pursuant to the Federal Superfund Act* [42 U.S.C. § 9601 *et seq.*, heretofore CERCLA].

(iii) Contaminated with a hazardous substance to the degree that its release or threatened release poses a substantial threat to the public health and safety or the environment as determined by the department.

(iv) Determined to be substantially harmful to public health and safety or the environment based on a standardized and uniformly applied department testing procedure and listed in regulations proposed by the department and promulgated by the Environmental Quality Board.

cordingly, neither plaintiff nor defendant is entitled to summary judgment as to any HSCA claim.

■ Count IV of Tri–County's Amended Complaint alleges negligence *per se* in violating statutory requirements. The bulk of this count consists of allegations that Clow violated the SWMA (Pennsylvania Solid Waste Management Act). Additionally, Tri–County alleges violations of the HSCA and avers that "[t]he policies of both the SWMA and HSCA are furthered by allowing violations of those statutes to serve as the basis for a claim of negligence *per se*."

In support of its motion for summary judgment defendant Clow correctly notes (1) that the SWMA does not create a private right of action for the recovery of money damages; *Fleck v. Timmons,* 374 Pa.Super. 417, 543 A.2d 148, 152 (1988); and (2) that a plaintiff cannot circumvent the lack of such a private cause of action by initiating a cause of action for negligence *per se* based·on SWMA violations; *Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 426 (M.D.Pa.1989). Defendant declines, however, to address or even to note Count IV's alternative reliance on the existence of alleged HSCA violations. Neither does defendant Clow consider whether Count IV would be a viable count in the event that a private cause of action exists under HSCA.

Insofar as this Court has held that a private cause of action exists under HSCA, the rationale of *Lutz v. Chromatex, supra,* does not apply to Count· IV. Accordingly, based on *Fleck, supra,* and *Lutz, supra,* this Court will grant summary judgment for defendant on Count IV *only* to the extent that Count IV relies upon SWMA violations.

■ Defendant Clow next contends that the common law negligence tort claims contained in Count IV, as well as the additional tort claims in Counts V, VI, VII and VIII, are time barred because they are based on tortious conduct and were not brought within the applicable two year Pennsylvania statute of limitations.[10] In so arguing defendant Clow acknowledges that, under Pennsylvania's "discovery rule," the statute is tolled until the plaintiff discovers, or should by reasonable diligence have discovered, the injury at issue. *See, e.g., Cathcart v. Keene Industrial Insulation,* 324 Pa.Super. 123, 135–36, 471 A.2d 493, 500 (1984) (*en banc*). Clow maintains, however, that plaintiff's common law causes of action were still not timely filed because the uncontested evidence establishes that plaintiff was aware of its "injury" well prior to September 10, 1988, two years before the September 10, 1990 commencement of this action.[11]

(35 Pa.Stat.Ann. § 6020.103, emphasis added).

**10.** The controlling Pennsylvania statute provides, in pertinent part, as follows:

The following actions and proceedings must be commenced within two years:

. . . . .

(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

42 Pa.Cons.Stat.Ann. § 5524(7).

Clow's request for summary judgment, based on a violation of this statute, does not extend to a request for relief as to the common law indemnification claim in Count X of the Amended Complaint. Accordingly, although Clow references this claim when it discusses the statute of limitations issue in its Reply Brief, this Court

will not treat that mere reference as a request for summary judgment as to Count X.

**11.** 42 U.S.C. § 9658, which is entitled "Actions under state law for damages from exposure to hazardous substances" (and is not applicable to response cost actions brought under § 9607, 42 U.S.C. § 9658(a)(1)), provides in pertinent part:

In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally ·required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1). Under CERCLA the phrase "federally required commencement

Since the common law claims were initiated more than two years after the discovery of the waste, this Court must determine the validity of Tri–County's reliance on *Piccolini v. Simon's Wrecking*, 686 F.Supp. 1063, 1075 (M.D.Pa.1988) in support of its argument that an "actor's *failure to remove from land in the possession of another a thing which he has tortiously ... placed on the land constitutes a continuing trespass for the entire time during which the thing is on the land ...*" (emphasis in original).

The cases considering Pennsylvania's continuing trespass doctrine are not entirely consistent.[12] Under Pennsylvania law, however, the critical distinction is whether the injury is permanent and effects a permanent change in the condition of the land, or whether the action concerns separate and recurrent injuries which cannot be ascertained or estimated so as to be brought in a single action. *Piccolini, supra* at 1076–1077; *Sustrik v. Jones & Laughlin Steel Corp.*, 413 Pa. 324, 327, 197 A.2d 44 (1964).

Crucial factors which must be considered in distinguishing between "permanent change" on the one hand, and " 'temporary', 'transient' or 'recurring' injury" on the other, are (1) the "ascertainability or predictability of the injury involved" and (2) "the question of the regularity of the incidents ..." *Graybill v. Providence Township*, 140 Pa.Commw. 505, 593 A.2d 1314, 1316–1317 (1991). Thus, in *Graybill*, where it was impossible to know how many incidents of flooding would occur, or what the severity of those incidents would be, the court found a continuing trespass. This case, however, does not present such a scenario and, therefore, does not involve a continuing trespass. The depositing of the waste was a completed act at the time that the property was conveyed. Further, it effected a permanent change in the condition of the land for which an accurate assessment of the total damages was possible. *See e.g. County of Allegheny v. Merrit Constr. Co.*, 309 Pa.Super. 1, 454 A.2d 1051 (1982); *compare Graybill, supra*. Thus, since plaintiff did not initiate the actions brought in Counts IV–VIII within two years of the discovery of the waste, they are barred by the statute of limitations. Summary judgment in favor of defendant will be granted as to those counts of the Amended Complaint.

Finally, Clow seeks summary judgment on the indemnification claim in Count X of the Amended Complaint solely on the ground that "Tri–County's alleged damages were caused by its own misconduct rather than by the actions of Clow."[13] Specifically, Clow argues that DER's investigation and subsequent remediation order were the product of Tri–County's own misbehavior in early 1988 when it mishandled barrels containing waste. This argument is without merit. As plaintiff points out in its brief in opposition to Clow's summary judgment motion:

> The fact that *DER's action against Tri–County* was the immediate result of Tri–

---

date," as used in § 9658, means "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). Section 9658, however, is largely irrelevant to this action. Because of Pennsylvania's discovery rule, the limitations period for plaintiff's common law tort claims is identical, regardless of whether Pennsylvania or CERCLA limitations law is applied. *See, e.g., Merry v. Westinghouse Electric Corp.*, 684 F.Supp. 852, 854 (M.D.Pa. 1988).

12. Defendant Clow suggests that the continuing trespass issue can be easily decided "because Tri–County has not asserted trespass or nui-

sance claims." While it is true that *Merry v. Westinghouse, supra* at 855, drew a distinction between trespass and nuisance claims on the one hand and negligence and strict liability claims on the other, the *Piccolini* court did not draw such a distinction. Rather, in *Piccolini*, the court, in ruling on a motion to dismiss, merely found that "discovery in this matter would be essential before a proper decision could be made on the issue of whether the actions of Defendants can be said to constitute a continuing tort." *Id., supra* at 1077.

13. Defendant Clow does not contend that the common law indemnification claim is redundant or that it cannot stand in the event that the other common law claims are removed from the case.

County's alleged misconduct in handling the barrels should not obscure the fact that Tri–County's private cause of action against Clow is a product of Clow's having buried the materials in the first place.

(emphasis in original). Summary judgment will not be granted on the indemnification claim.

 The third motion before the Court is Tri–County's motion to strike defendant's jury trial demand. In this motion plaintiff correctly notes that there is substantial authority holding that there is no right to a jury trial on CERCLA restitution claims which are equitable in nature. *E.g. United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir.1986); *Mid Valley Bank v. North Valley Bank*, 764 F.Supp. 1377 (E.D.Cal.1991); *United States v. Mottolo*, 605 F.Supp. 898 (D.N.H.1985) (collecting cases); *United States v. Tyson*, 22 E.R.C. (B.N.A.) 1471 (E.D.Pa.1984); *United States v. Wade*, 653 F.Supp. 11, 13 (E.D.Pa.1984). Defendant challenges the logic and analyses of the courts that have decided this issue and maintains that CERCLA response claims are not equitable in nature. This Court, however, will not re-examine or re-evaluate the extensive and well settled authority holding that there is no right to a jury trial on CERCLA response claims.

In response to plaintiff's motion to strike the jury demand, defendant Clow, who moved for summary judgment as to all of plaintiff's common law claims, next contends, based on *Molthan v. Temple University*, 778 F.2d 955, 961 (3d Cir.1985), that the right to a jury trial exists as to *all* of plaintiff's claims because the right to a jury trial exists as to the common law negligence, misrepresentation and strict liability claims.

Despite the grant of summary judgment on the negligence, misrepresentation and strict liability claims, defendant would remain entitled to a jury trial under *Molthan*

if there is a right to a jury trial on either the indemnification claim or the pending HSCA (Hazardous Sites Cleanup Act) claims.

With respect to the indemnification claim there is without question a right to a jury trial under Pennsylvania law. Indemnity in Pennsylvania is a common law action which has been described as a "right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable ..." *Sirianni v. Nugent Bros., Inc.*, 509 Pa. 564, 506 A.2d 868, 871–872 (1986), quoting and reaffirming *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368 (1951). As such, unlike matters which were traditionally tried in the equity courts, an indemnification claim is a claim as to which there is a right to a jury trial. Since there is a right to a jury trial on an indemnity claim, this Court will apply *Molthan* and, based thereon, will deny plaintiff's motion to strike the jury trial request made by defendant.

As a result of *Molthan's* application, this Court need not decide the novel question of whether there is a right to a jury trial on the pending HSCA claims which constitute a private cause of action. However, even if it were ultimately determined that this Court incorrectly applied *Molthan* and that no right to a jury trial exists on HSCA response cost claims, the result would be no different.[14] Under the circumstances of this case, the Court deems this case as an appropriate one for an advisory jury pursuant to Rule 39(c) of the Federal Rules of Civil Procedure. For this additional reason, the motion to strike the jury trial request will be denied.

 The final motion before the Court is the motion of Clow, filed pursuant to Rule 26(b)(4)(A) of the Federal Rules of Civil Procedure, to compel the deposition of

---

**14.** A very substantial basis for concluding that HSCA response claims, like a CERCLA response claims, are equitable in nature and therefore that there is no right to a jury trial. The contrary argument asserted by Clow is that a HSCA response cost claim is a codification of a common law strict liability claim and that there is therefore a right under Pennsylvania law to a jury trial because the proceeding has a basis in common law.

plaintiff's expert James Smith.[15] The question of whether to permit such a deposition is a matter within the sound discretion of a trial Court which is particularly well advised to grant such a motion where, as here, expert testimony will be critical and the expert's report is generalized. *See, e.g., Dennis v. BASF Wyandotte Corp.,* 101 F.R.D. 301, 303–304 (E.D.Pa.1983); *Butler v. Yamaha Motor Co., Ltd.,* Civil Action No. 89–1380, 1991 WL 233292 (E.D.Pa.1991) (1991 U.S.Dist.LEXIS 15846).

Based on the pleadings and the record, and most especially on the critical importance of expert evidence in this case, this Court believes that the interests of justice will be best served by granting defendant's motion and allowing a deposition of plaintiff's expert pursuant to restrictions as contemplated by Rule 26(b)(4)(A). *Dennis, supra; Butler, supra.* As a pre-condition, however, defendant Clow must agree to make its expert available for deposition by plaintiff, should plaintiff wish to conduct such a deposition. No expert witness deposition shall exceed four hours, without leave of Court. The depositions shall be concluded within 20 days of the accompanying Order. Finally, any party electing to depose the opposing party's expert pursuant to this Order shall pay the expert a reasonable fee for his time. *Dennis, supra,* n. 3 at 304.

An appropriate order follows with respect to all pending motions.

### ORDER

AND NOW, this 8th day of May, 1992, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of plaintiff Tri–County Business Campus Joint Venture for summary judgment is DENIED;

(2) the motion of defendant Clow Corporation for summary judgment is GRANTED as to Counts IV–VIII of the Amended Complaint and is OTHERWISE DENIED;

(3) the motion of plaintiff Tri-county Business Campus Joint Venture to strike defendant's jury trial demand is DENIED; and

(4) the motion of defendant Clow Corporation to depose plaintiff's expert James Smith is GRANTED, subject to the terms and conditions set forth in the accompanying Memorandum of the Court.

---

**15.** Fed.R.Civ.P. 26(b)(4)(A) provides as follows: (i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(4)(C) of this rule, concerning fees and expenses as the court may deem appropriate.