**COMMONWEALTH of Massachusetts, Plaintiff,**

v.

**BLACKSTONE VALLEY ELECTRIC COMPANY, et al., Defendants.**

CA No. 87–1799–T.

United States District Court, D. Massachusetts.

Nov. 7, 1994.

---

tion ("DEP") for development of a record on the issue of response costs. Both parties have had the opportunity to supplement the administrative record, and the case has now returned to this court. Presently before the court is the Commonwealth's Motion for Summary Judgment as to Response Costs.[2]

Robert W. Ritchie and Karen A. McGuire, Atty. General's Office, Boston, MA, for plaintiff.

Stephen M. Leonard, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Christine M. Gravelle, Peter J. McGinn, Tillinghast, Collins & Graham, Providence, RI, David A. Fazzone, McDermott, Will & Emery, Boston, MA, John Voorhees, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, and Patrick W. Hanifin, New England Legal Foundation, Boston, MA, for defendants.

### MEMORANDUM

TAURO, Chief Judge.

The Commonwealth of Massachusetts cleaned up a hazardous waste site in Attleboro, Massachusetts, and brought suit under CERCLA to recover the costs incurred. In December of 1992, this court issued an order granting partial summary judgment to the Commonwealth on all issues of liability.[1]

Rather than enter judgment at that time, the court remanded the case to Massachusetts Department of Environmental Protec-

## I.

### The CERCLA Standard

■ Defendant Blackstone Valley Electric Company ("BVE") challenges the Commonwealth's motion for summary judgment by claiming that the response cost expenditures were inconsistent with the applicable National Contingency Plan[3] ("NCP") and, therefore, beyond the scope of their CERCLA liability. *See* 42 U.S.C. § 9607(a)(4)(A) (scope of CERCLA liability).

■ Under CERCLA, when the federal government or a state sues to recover response costs, the burden is on the defendant to establish that the expenditures were inconsistent with the NCP. *United States v. Hardage*, 982 F.2d 1436 (10th Cir.1992) (consistency with NCP presumed when government seeks recovery); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 747 (8th Cir.1986) (hereinafter *"NEPACCO "*), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Sherwin–Williams Co. v. City of Hamtramck*, 840 F.Supp. 470, 475 (E.D.Mich.

1. *Massachusetts v. Blackstone Valley Electric Co.*, 808 F.Supp. 912 (D.Mass1992).

2. The present motion involves a review of agency decision making, and is a question of law appropriately decided on summary judgment. The First Circuit has held that "Summary Judgment is warranted where the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine factual dispute and the moving party [is] entitled to judgment as a matter of law." *Siegal v. American Honda Motor Co.*, 921 F.2d 15, 17 (1st Cir.1990); Fed. R.Civ.P. 56(c).

3. Two National Contingency Plans are referred to in the course of this opinion. The 1982 NCP is found at 47 Fed.Reg. 31180 (1982). The 1985 NCP is found at 50 Fed.Reg. 47912 (1985).

There is a disagreement among the parties as to which NCP applies to the DEP's actions at Warren Road. BVE maintains that the agency's

actions should be measured against the 1982 NCP, the plan in effect when cleanup efforts began in July of 1984. The Commonwealth asks that their efforts be measured against the 1985 NCP, adopted while cleanup operations were underway.

As an initial matter, the court notes the similarities between the two plans with respect to all elements essential to this decision. In any event, the court finds that 1985 plan should be applied only to cleanup costs incurred after the newer plan became effective. *Tri–County Business Campus Joint Venture v. Clow Corp.*, 792 F.Supp. 984, 990–91 (E.D.Pa.1992) (choosing between 1985 and 1990 NCP); *Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1574 (E.D.Pa. 1988); *Louisiana–Pacific Corp. v. Asarco, Inc.* 24 F.3d 1565, 1576 n. 7 (9th Cir.1994).

1993); *U.S. v. Amtreco, Inc.*, 809 F.Supp. 959 (M.D.Ga.1992). In order to show that a clean up procedure was inconsistent with the NCP, a defendant must establish that an agency "acted arbitrarily and capriciously in choosing a particular response action...." *Hardage*, 982 F.2d at 1442 (citing *NEPACCO*, 810 F.2d at 748); *Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889, 907 (5th Cir. 1993). This standard of proof was designed in deference to the highly technical nature of environmental cleanup efforts, and the realization that the expertise of agencies charged with environmental protection should not be second-guessed by the courts. *NEPACCO*, 810 F.2d at 748; *U.S. v. American Cyanamid Co.*, 786 F.Supp. 152, 158 (D.R.I.1992) (CERCLA language requires deference to agency).

■ According to the this highly deferential standard, a court revisits an agency's cleanup decision only to determine if the agency examined the relevant data, based its decision on materials contained in the record, and "articulate[d] a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Asso. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Where almost a decade has passed since the clean-up operation in question, it is worthwhile to note that the propriety of the DEP's response must be measured with reference to the information available to the agency at the time that these choices were made.

## II.

### Analysis

■ Pursuant to the statutory mandate of 42 U.S.C. § 9601(23) and (24), the 1982 NCP identifies two types of response actions: removal actions and remedial actions. Removal actions are actions designed to secure removal of hazardous waste from contaminated sites. These actions are deemed appropriate when the lead agency (in this case the DEP) determines that "[t]he public and/or environment will be at risk from exposure to hazardous substances if response is delayed...." 1982 NCP § 300.67(a)(2). The NCP includes criteria that the agency may

use in making this determination. *See* 1982 NCP § 300.67(c)(1)–(6); *See also*, 1985 NCP § 300.65(b)(2)(i)–(viii) (factors to consider in determining the extent of removal action). Remedial actions, defined in 1982 NCP § 300.68(a), are "those responses ... consistent with permanent remedy to prevent or mitigate the migration of a release of hazardous substances into the environment." 1982 NCP § 300.68(a); *See* 47 Fed.Reg. 31182 (discussing differences between removal and remedial actions); *Versatile Metals*, 693 F.Supp. at 1577.

The distinction between the several response actions is important because it will determine the extent to which a site must be evaluated before cleanup efforts begin. As noted in the comments that accompanied the promulgation of the 1982 NCP, "[t]he basic premise supporting the evaluation scheme is that the less imminent the threat, the greater the time available for the evaluation process." 47 Fed.Reg. 31181 (1982). As a result, the NCP may require that remedial actions be preceded by certain tests or evaluations not required of removal actions. *See Tri–County Business Campus v. Clow Corp.*, 792 F.Supp. 984, 991 (E.D.Pa.1992) (remedial actions subject to "more stringent requirements"); *Sherwin–Williams, supra*, 840 F.Supp. at 475 ("The distinction is important because the type of action determines the nature and complexity of the regulations governing ... compliance with the NCP.").

BVE argues that the response chosen by the agency cannot fairly be characterized as a removal action. BVE's argument is apparently based upon the DEP's characterization of their response plan as an initial remedial measure ("IRM"). BVE argues that because IRMs are defined in § 330.68, which governs remedial actions, the agency's plan should be subject to the procedural requirements of the section. The agency contends that the plan it adopted was a removal, free from the requirements of § 330.68.

Upon review of the record, the court believes that this action was a removal, chosen according to criteria outlined in the applicable NCP, and classified as such on the basis of information contained in the administrative record at the time.

■ As an initial matter, the court notes that a cleanup operation can be both a removal and a remedial action. It is clear from the notes accompanying the promulgation of the 1982 NCP that remedial and removal actions are not mutually exclusive. Remedial action can be taken "instead of, or in addition to, removal action ..." Fed.Reg. 31205 (1982). As a result, the preparation and implementation of an IRM does not preclude the existence of a removal action. Indeed, it is inherent in the incremental approach of the statute that a response action may begin as a removal and be transformed into a remedial action as the threat of contamination subsides.[4] *See* 50 Fed.Reg. at 47,930.

The court also notes that the portions of the 1982 NCP intended to guide the selection of an appropriate response plan were necessarily, indeed deliberately, vague. The comments that accompany the promulgation of the plan reflect both the EPA's inexperience in environmental cleanup at that time and the desire to adopt procedures that would allow agencies a certain amount of discretion in formulating adequate response actions:

> EPA developed the methodology for determining the appropriate extent of remedy based on the recognition that experience in developing remedies for hazardous waste sites is limited. Moreover, each hazardous waste site has unique characteristics which merit individual attention.... These considerations led EPA to develop a methodology which would provide structured and reasoned decision-making while still allowing the flexibility to deal with unique and unforseen [sic] characteristics. Fed.Reg. 31184 (1982).

Under the 1982 NCP, immediate removal actions are deemed appropriate where "the lead agency determines that the initiation of immediate removal action will prevent or mitigate immediate and significant risk of harm to human life or health or to the environment ..." 1982 NCP § 300.65(a).

The DEP submits that two factors were particularly relevant to its selection of a response plan. These included the possibility of human contact with the hazardous material, and the presence of contaminated material "at or near surface, posing a serious threat to public health or the environment."[5] The administrative record reveals that the agency was aware of facts bearing on these factors in selecting a response plan. Initial site reports are replete with references to "blue sludge" at or near the surface.[6] Preliminary testing suggested that soil found at the site contained high concentrations of toxic cyanides.[7] The fact that the waste was discovered in the construction of residential property is itself indicative of the risk that a "nearby population" be exposed to the waste at Warren Road.[8]

---

4. In addition, although the 1982 plan is somewhat ambiguous in this respect, the court believes that measures adopted pursuant to § 300.68(e)(1) of the 1982 plan may properly be characterized as removal actions, free from the requirement that alternative remedial measures be assessed at each phase.

5. These criteria are apparently taken from the language of the 1985 NCP at § 300.65(b)(2)(i), (iv). The 1982 plan does not specifically enumerate factors relevant to the removal decision. Nevertheless, the court finds it appropriate to consider the factors listed in the 1985 plan in reviewing the DEP's choice of its response action. The comments that preceded the promulgation of the 1985 plan make it clear that the specifically enumerated criteria were intended to clarify, not alter, the factors to be considered in an agency's removal decision. *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1574 (E.D.Pa.1988) ("To the extent that the subsequent regulations clarify the prior regulations as to private party obligations, such regulations will govern.").

6. Administrative Record for the Mendon Road, Attleboro, Hazardous Waste Site [hereinafter Administrative Record] at 2100003 (Site Assessment Notes dated 10/03/84); Administrative Record at 2200008, 2200009 (DEP Potential Hazardous Waste Site Preliminary Assessment indicating visual observation of soluble "blue sludge"); Administrative Record at 2100009 (HydroSample Hazardous Waste Evaluation).

7. Administrative Record at 2100002 (Massachusetts Department of Environmental Quality Engineering ("DEQE") Special Analysis); Administrative Record at 2100009 (HydroSample Hazardous Waste Evaluation) ("Initial sampling by DEQE indicated high concentrations of cyanides in these materials."); Administrative Record at 2100006 (DEQE Status Report);

8. Administrative Record at 2200001, 2200003, 2200005 (Letters of responsibility from Commonwealth to property owner reporting that "hazardous waste is present on this site and pose [sic] a threat to public health and the environment.").

Although neither the size of the operation nor the amount of time that separates identification from cleanup are dispositive of the classification of a response operation, the court notes that both factors in this case fell well within the range of reported removal actions. *See, e.g. Con–Tech Sales Defined Ben. Trust v. Cockerham,* 1991 WL 209791, *7–8, 1991 U.S.Dist. LEXIS 14624, *26 (E.D.Pa. October 9, 1991); *Compare Sherwin–Williams,* 840 F.Supp. 470, 475 (five year cleanup effort indicative of remedial action).

As noted earlier, removal operations, because of the emergency conditions in which they occur, are subject to less stringent testing and evaluation requirements than the more permanent remedial operations. The evaluation and testing requirements of a removal operation are streamlined accordingly. For the purposes of this motion, the streamlined procedure is most important in that it does not require either a feasibility study or the consideration of more cost-effective alternatives. *Compare* 1982 NCP § 330.68(f) (remedial actions requiring cost-effectiveness evaluation). Because removal actions do not require the formal consideration of more cost effective alternatives, the agency's choice cannot be considered arbitrary and capricious for failure to conduct a formal inquiry into more cost-effective cleanup alternatives.

The agency in this case decided to undertake a removal at the Warren Road site. The administrative record suggests that this decision was reasonable on the basis of information available to the agency at the time.

Having determined that the agency's classification of its cleanup effort was within the bounds established by CERCLA and the applicable NCP, the court consequently finds that the execution of the plan was within the bounds of agency discretion.

Once the lead agency determines that removal action is appropriate, the 1982 NCP instructs that "defensive actions should begin as soon as possible to prevent or mitigate danger to the public health, welfare, or the environment." 1982 NCP § 300.65(b). Pursuant to § 300.65, an agency may "[move] hazardous substances offsite for storage, destruction, treatment, or disposal ..." 1982 NCP § 300.65(b)(6). Section 300.65 expressly provides that the agency be given wide latitude in selecting the appropriate response to the perceived threat. 1982 NCP § 300.65(b).

In conclusion, the court finds that the DEP response action at the Warren Road site was selected and implemented in accordance with the standards laid out for the agency in CERCLA and the applicable National Contingency Plan.

### III.

### *M.G.L. c. 21E § 5(a)*

 The parties are unable to agree on the proper standard for the Commonwealth's claim under M.G.L. c. 21E, the Massachusetts state law analog to CERCLA. The parties' inability to agree on a standard arises out of the absence of a Massachusetts Contingency Plan ("MCP") applicable to the time period in question.[9]

The Commonwealth argues that, in the absence of an applicable Massachusetts Contingency Plan, recovery can be had for all response costs that the agency deemed "reasonably necessary." BVE counters that the agency's action should be measured against the federal NCP in effect at the time. Having found that BVE has failed to establish that DEP expenditures were inconsistent with the NCP, it is unnecessary to decide the standard against which the DEP's actions should be judged under M.G.L. ch. 21E. Even if recovery under state law were dependant on compliance with the federal NCP, the court has already found that the DEP complied with the applicable NCP in carry-

---

Administrative Record 2200037 (Agency Memorandum indicating "seriousness of health threat due to close proximity of residential dwellings."); Administrative Record at 2200027 (letter from Massachusetts Department of Health to landowner warning of potential health hazard); Administrative Record at 2200036 (memorandum to file indicating presence of residents, including a pregnant woman, at the Mendon Road site).

**9.** The first Massachusetts Contingency Plan was not promulgated until 1988, well after the response costs at issue in this case were incurred.

ing out the Mendon Road cleanup operation. The Commonwealth is entitled to summary judgment on the Massachusetts state law claim.

## IV.

### *Litigation Costs and Interest*

■ Having found BVE liable to the Commonwealth of Massachusetts for the full amount of response costs incurred at the Warren Road site, the court turns to the issue of litigation costs and interest. The dispute with respect to this issue lies in the choice of statutory authority for the calculation of prejudgment interest. The Commonwealth asks that prejudgment interest be calculated pursuant to M.G.L. ch. 21E § 13. Chapter 21E, § 13 provides that liability to the Commonwealth constitutes a debt, and that interest on debts to the Commonwealth accrues at a twelve percent annual rate. BVE asks that interest be calculated according to CERCLA's prejudgment interest provisions.

In considering the accrual of prejudgment interest under parallel state and federal statutes, the First Circuit has generally allowed the successful plaintiff to choose which statute will govern the calculation of interest due. *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1345 (1st Cir.1988); *Doty v. Sewall,* 908 F.2d 1053, 1063 (1st Cir.1990). Because BVE has been found liable for the full extent of response costs under both federal and state law, the Commonwealth may choose which statute to use in the calculation of interest. The Commonwealth has understandably asked that prejudgment interest be calculated according to the higher state law interest rate.

## V.

### *Conclusion*

For the foregoing reasons, the court finds that the Commonwealth of Massachusetts is entitled to summary judgment on the issue of response costs. Judgment is hereby rendered for the full amount of response costs incurred by the Commonwealth, plus interest and litigation expenses calculated to the date

of judgment. Within fourteen days, the parties are to submit a proposed order to that effect.