543 A.2d 148

**Theodore R. FLECK and Mary E. Fleck, Appellants,**

v.

**Frank E. TIMMONS and Susan E. Timmons, and McCleary Oil Co. Inc., Appellees.**

Superior Court of Pennsylvania.

Argued April 7, 1988.

Filed June 9, 1988.

418

Eugene E. Dice, Harrisburg, for appellants.

Sally Jo Winder, Shippensburg, for Timmons, appellees.

Jeffrey B. Rettig, Harrisburg, for McCleary, appellee.

Before BROSKY, MONTEMURO and JOHNSON, JJ.

MONTEMURO, Judge:

This appeal concerns a civil action commenced by Theodore R. and Mary E. Fleck, appellants, against Frank E. and Susan E. Timmons, appellees, and McCleary Oil Company Inc.[1] The record reveals that appellees own and operate a convenience store and gas station located on Cumberland Highway, Orrstown, Pennsylvania. Appellants reside in a

---

1. McCleary Oil Company, Inc., an appellee in the present appeal, will be referred to throughout this Opinion as "McCleary Oil."

house which is located directly across the highway from appellees' convenience store and gas station. The sole source of water supply for appellant's home is a well. This well is located in the front of appellants' home, between their home and Cumberland Highway.

In their amended complaint, appellants alleged that on or about November 30, 1984 they noticed a "strong odor of gasoline in their drinking water." R.R. at 40a. They further alleged that their "well water is contaminated to the point where it is not usable for drinking, washing, cooking, or any purpose other than flushing toilets. Additionally, the concentration of gasoline in the well water is such as to pose a threat of fire or explosion in the Fleck household." *Id.* at 42a. It is undisputed that in September of 1983, appellees purchased property adjacent to their convenience store and gas station from the Guy T. Kilmore Estate. This property included an abandoned gasoline service station and three underground storage tanks (hereinafter "Kilgore tanks"). On November 27, 1984, at the request of the appellees, McCleary Oil pumped approximately 645 gallons of kerosene into the Kilgore tanks.[2] It was established that prior to pumping of any kerosene into the Kilgore tanks, appellees, specifically Mr. Timmons, removed with the aid of a hand pump approximately 100 gallons of gasoline which had been left in the tanks by the previous owner.

Appellants' lawsuit against both the appellees and McCleary Oil is based on the contention that when McCleary Oil pumped kerosene into the Kilgore tanks on November 27, 1984, this pumping resulted in the pollution

---

**2.** It appears from the record that in November of 1984, McCleary Oil pumped kerosene into only two of the three Kilgore storage tanks. Brief for Appellant at 19. For the purposes of this appeal, it is not necessary to distinguish between the three Kilgore tanks. It is also apparent that the November 1984 kerosene delivery was actually the second time appellees had ordered kerosene for the Kilgore tanks from McCleary Oil; McCleary Oil delivered 375 gallons of kerosene in June or July of 1984. This earlier delivery of kerosene was also pumped into the Kilgore tanks by McCleary Oil. Brief of Appellant at 19.

of their well water.[3]   Appellants averred the following:

16.   One or all of the three underground storage tanks [the Kilgore tanks] in which Mr. Timmons maintained gasoline and into which Mr. Timmons caused kerosene to be pumped as described herein, were leaking, and this leakage caused contamination of groundwater and the permanent destruction of the well water serving Plaintiff's house.

16.   (a) The underground storage tanks [the Kilgore tanks] were excavated and removed on June 24, 1985. They were found to be badly corroded and had holes through the metal of which they were constructed.   At the time they were excavated, the tanks contained petroleum products containing benzene, toluene, exylene, trimethyl benzene, methyl nephthalene, and other similar chemicals.   These chemicals are hazardous and constitute hazardous waste.

R.R. at 40a and 41a.[4]   As to the appellees and as to McCleary Oil, appellants sought to support their claim for relief upon a variety of legal theories.   They contended that appellees were negligent in filling the Kilgore tanks "given their age, condition, and period of time during which they

3.   We note that appellant's amended complaint contained the following paragraph:

One or more of the underground storage tanks containing petroleum products and serving the Frank Timmon's store, gas station facility, have leaked and caused contamination of groundwater. This leakage caused groundwater contamination and contamination of drinking water to Frank Timmon's store, which occurred since at least 1979.   No steps were taken by Timmons to correct or investigate this leaking tank situation.

R.R. at 43a.   In addition to the three Kilgore tanks, appellees have four underground storage tanks on the property where the convenience store and gas station are located.   These tanks are used to store various fuel products for retail sale.   Appellees denied that any of these particular storage tanks have ever leaked.   R.R. at 64a.   Our thorough review of the evidence produced at trial and the trial court's charge to the jury reveals that appellants based their claim for relief in the instant case solely upon appellees' use of the three Kilgore storage tanks.

4.   It was established at trial that prior to excavating the three Kilgore tanks, the kerosene in the tanks was removed by McCleary Oil.   N.T. August 26, 1986 at 304.

had not been used." R.R. at 42a. Appellants also alleged, *inter alia,* that the conduct of the appellees in filling the Kilgore tanks had violated state regulations governing the maintenance of underground storage tanks, as well as various provisions of the Pennsylvania Clean Streams Law [5] and Pennsylvania's Solid Waste Management Act.[6] Appellants also set forth theories of liability sounding in absolute liability and nuisance. Appellants asserted causes of action against McCleary Oil which were substantially the same.

The jury trial commenced in the instant case on August 26, 1986. After the close of appellants' case, the trial court granted McCleary Oil's motion for a directed verdict. Following the completion of the trial, the jury returned a verdict in favor of the appellees, finding that the appellees had been negligent but that their negligent conduct was not a substantial factor in bringing about the pollution of appellants' well water supply. Timely post-trial motions were filed and denied by the trial court on September 25, 1987. Appellants seek our review of the following issues:

1. Whether the trial court erred in refusing to charge the jury on the applicability of a rebuttable presumption of liability created by Section 611 of Pennsylvania's Solid Waste Management Act?

2. Whether the trial court erred in entering a directed verdict in favor of McCleary Oil?

3. Whether the trial court erred when it limited the scope of the testimony of expert witness Mr. Jeffrey Molnar?

We find no error on the part of the trial court in the present case and, accordingly, we affirm.

Pennsylvania's Solid Waste Management Act, "SWMA", regulates the storage, transportation, treatment, and disposal of municipal waste, residual waste, and hazardous waste. Our concern in this case centers upon hazardous

5. 35 P.S. § 691.1 *et seq.*

6. Act of 1980, July 7, P.L. 380, No. 97, §§ 101–1003; 35 P.S. § 6018.101 *et seq.*

waste. Hazardous waste is defined in the SWMA as follows:

> any garbage, refuse, sludge from an industrial or other waste water treatment plant, sludge from a water supply treatment plant, or air pollution control facility and other discarded material including solid, liquid, semi-solid or contained gaseous material resulting from municipal, commercial, industrial, institutional, mining, or agricultural operations, and from community activities ...

35 P.S. § 6018.103. The SWMA, and its accompanying detailed regulations, provide for a comprehensive regulation of the handling of hazardous wastes within the Commonwealth of Pennsylvania. This act requires that persons or municipalities who generate, transport, treat or dispose of hazardous wastes comply with the licensing and permit regulations of the Department of Environmental Resources of the Commonwealth of Pennsylvania (hereinafter "DER"). *See* 35 P.S. § 6018.403 and 6018.501; 25 Pa.Code 75.262–282. Provisions of the SWMA also require, *inter alia,* the maintenance of adequate records concerning the handling of hazardous wastes, the use of appropriate containers and labels, the development of contingency plans for effective action to abate hazards, and the immediate notification of the DER in the event of any spill or accidental discharge. *See* 35 P.S. § 6018.403.

■ Appellants in the instant case urge us to find that the trial court erred when it refused to charge the jury as to the following section of the SWMA:

> *Presumption of law for civil and administrative proceedings*
>
> It shall be presumed as a rebuttable presumption of law that a person or municipality which stores, treats, or disposes of hazardous waste shall be liable, without proof of fault, negligence, or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the area where hazardous waste activities have been carried out. Such presumption may be overcome by clear and convincing evidence that the person or municipality

so charged did not contribute to the damage, contamination, or pollution.

35 P.S. § 6018.611. This section of the SWMA (hereinafter "Section 611") is part of Article VI of the SWMA. Article VI is entitled: "Enforcement and Remedies." [7] When Article VI is read in its entirety, it is clear that our legislature intended to provide the DER with "wide-ranging enforcement tools" so that the SWMA would, in reality, have the means to accomplish the invaluable ends for which it was enacted: the prevention of harm to public health and the preservation of our environment. Katcher, *Hazardous Waste Management under Act 97*, 86 Dick.L.Rev. 665, 684 (1982).[8] Article VI begins by declaring that any violation of the SWMA or any "rule or regulation ... order ... term or condition of any permit ..." of the DER constitutes a public nuisance. 35 P.S. § 6018.601. The Article then sets forth the variety of ways in which the DER is authorized to enforce the provisions of the SWMA:

> For example, civil and criminal penalties may be imposed ... in amounts up to $500,000 per day for certain criminal hazardous waste related violations. In addition, violators may be liable for the cost of abating pollution resulting from their violations. DER may issue administrative enforcement orders, including oral orders to persons engaged in hazardous waste treatment or disposal activities that jeopardize the public health, safety, or welfare, as well as seek injunctive relief and the forfeiture of contra-

7. We note that the provisions of Article VI of the SWMA apply not only to hazardous wastes, but also to municipal and residual wastes as these categories of wastes are defined in the SWMA. *See* 35 P.S. § 6018.103.

8. We recognize that the SWMA also provides that county and municipal officials may institute actions to enjoin violations of the SWMA and to recover the costs of abatement. 35 P.S. §§ 6018.604 and 613. In this Opinion, we are considering the role of private citizens in the enforcement of the provisions of the SWMA, as compared to that of the DER and county and municipal officials. In the interest of clarity, we will not specifically discuss county and municipal enforcement of the SWMA because the remedies accorded to counties and municipalities under the SWMA are duplicative of the remedies which the DER may pursue.

band. To aid in enforcement efforts, DER is given the right to enter any solid waste facility to conduct inspections and official investigations, and to take samples. DER may also procure a search warrant, upon probable cause, to enter any other property for the purposes of official investigations.

Katcher, *supra* at 684. Throughout Article VI of the SWMA, the legislature consistently states that it is the "department", the DER, which shall be responsible for pursuing the specific remedies and enforcement techniques set forth in Article VI. For example, in 35 P.S. § 6018.-602(a), the act specifically provides that "the department may issue orders to such persons and municipalities as it deems necessary to aid in the enforcement of the provisions of this act." It is also "the department" which is authorized by the language of Article VI to pursue injunctive relief for violations of the SWMA and to assess civil penalties for such violations. 35 P.S. §§ 6018.604 and 605. It is the "department" which is to recover the costs of abating a public nuisance. 35 P.S. § 6018.613. Thus, the SWMA, by its express terms, restricts the right to seek relief for the violation of its provisions to the DER. *See City of Philadelphia v. Stepan Chemical Company*, 544 F.Supp. 1135 (E.D.Pa.1982) (The Pennsylvania Clean Streams Act restricts the right to collect civil penalties to the Department of Environmental Resources under 35 P.S. § 691.605 which provides that "... *the department*, after hearing, may assess a civil penalty upon a person or municipality for such violation.") Even though the SWMA is a remedial statute, to be construed liberally, this principle does not justify an interpretation of the statute which is inconsistent with its express language. *Id.* at 1149.

Although the legislature provided the DER, and not private citizens of the Commonwealth, with the authority to obtain relief for violations of the provisions of the SWMA, the legislature did consider private citizens and accordingly, provided private citizens with limited access to actions brought to enforce the SWMA. In actions brought initially

by the DER to obtain injunctive relief or to seek to impose a civil penalty for a violation of the SWMA, a private citizen with an interest which may be adversely affected was granted the right by our legislature to intervene. 35 P.S. § 6018.615. Thus, although private citizens were not afforded with the right to use the specific provisions of the SWMA to institute a cause of action to obtain injunctive relief or monetary damages in their own right, the legislature provided citizens with an opportunity to become actively involved in DER actions under the SWMA where their own interests are in some way implicated. Private citizens, of course, may also pursue common law actions, as did the appellants in the case at bar, when they believe they have been harmed by the handling of hazardous wastes in their environment. Indeed, the legislature, when enacting the SWMA, specifically expressed its intent that the provisions of the SWMA do not "in any way abridge or alter" causes of actions existing in equity or under the common law:

 It is hereby declared to be the purposes of this act to provide additional and cumulative remedies to control the collection, storage, transportation, processing, treatment, and disposal of solid waste within the Commonwealth, and nothing contained in this act shall in any way abridge or alter rights of action or remedies now or hereafter existing is equity, or under the common law or statutory law, criminal or civil ...

35 P.S. § 6018.607.

 When ascertaining the legislative intent underlying Section 611, we are bound to consider Article VI of the SWMA as a whole and avoid according Section 611 an interpretation which does not take into account related sections of Article VI. 1 Pa.C.S.A. § 1921(a); *Causer v. Mandarino*, 338 Pa.Super. 564, 488 A.2d 36 (1985). It is clear to us that the legislature did not intend to allow the legal presumption created in Section 611 of the SWMA to be used in any legal proceeding other than a proceeding instituted by the DER, wherein the DER charges a municipality or a person with a violation of the SWMA or its regula-

tions.[9] To hold otherwise would be to allow private citizens to recover for hazardous waste activities with no proof of fault, negligence, or causation. Such a result is contrary to the specific language of 35 P.S. § 6018.607 and flys in the face of Article VI of the SWMA which, as we have recognized, reposes "... in the legislative branch (DER, county health departments and municipalities) broad powers of and responsibilities for enforcement and has given the prosecutors a vast array of legal mechanisms with which to battle the tide of pollution and environmental catastrophe that has accompanied man's 'progress' toward a highly mechanized, industrial and disposable society." *Commonwealth v. Parker White Metal Company*, 512 Pa. 74, 97, 515 A.2d 1358, 1370 (1986). The legal presumption created by Section 611 of the SWMA is one such "battle mechanism" meant for the exclusive use of the executive branch in its continuing, and no doubt arduous, task of regulating the solid waste practices in this state. This legal presumption was never meant to be used in legal actions instituted by private citizens. We therefore find no error in the trial court's refusal in the instant case to charge the jury concerning Section 611 of the SWMA.[10]

■ We also find that the trial court did not err in entering a directed verdict in favor of McCleary Oil. It is well settled that when ruling on a motion for a directed verdict, the trial court must accept as true all facts and inferences tending to support the allegations of the party against whom the motion has been made. "In reviewing the grant or denial of a motion for a directed verdict, we must determine if 'an abuse of discretion or error of law

9. In addition to the DER, it appears that municipal and county officials may use the Section 611 presumption in proceedings they institute under the SWMA. *See* n. 8, *infra.*

10. In addition to concluding that the Section 611 presumption may not be used in a private lawsuit, the trial court also held that gasoline or kerosene stored for retail sale does not qualify as a "hazardous waste" as defined in § 6018.103 of the SWMA. Op. of Trial Court at 2. We express no opinion on the merits of this determination by the trial court because we have held, on alternative grounds, that Section 611 of the SWMA is not applicable in the present case.

which controlled the outcome of the case occurred'.... If so, only then will we reverse." *Bucchianeri v. Equitable Gas Company,* 341 Pa.Super. 319, 328, 491 A.2d 835, 840 (1985) (citations omitted). The trial court in the case at bar granted McCleary Oil's motion for a directed verdict because "taking all of plaintiffs' evidence as true, they failed to establish the requisite elements of duty and causation." Op. of Trial Court at 7. We need not address the issue of duty because the evidence presented at trial by the appellants, even when viewed in the light most favorable to appellants, reveals no evidentiary support for a finding of legal causation.

It is undisputed that McCleary Oil pumped kerosene into the Kilgore tanks on November 27, 1984. Appellants' expert witness Mr. Jeffrey Molnar, a hydrogeologist employed by the DER, was of the opinion that based upon the geological characteristics of the area surrounding appellants' property, at least one of appellees' seven underground storage tanks had leaked and caused weathered gasoline to pollute appellants' well water. R.R. at 186a.[11] Mr. Molnar acknowledged, however, that he could not determine which of the seven storage tanks owned and operated by appellees had resulted in the pollution of the well water. *Id.* Mr. Molnar further acknowledged that he did not know when this alleged leak had occurred, and that it could have occurred as early as 1981. R.R. at 187a. Mr. Molnar also testified concerning the contents of various soil and water tests which the DER had performed. Three chemical tests of appellants' well water performed by the DER verified that the well water was polluted with weathered gasoline. R.R. at 183a. When the Kilgore tanks were removed, a sample of residue lining the bottom of the tanks was analyzed by the DER and found to be "similar to a kerosene." R.R. at 184a. The only testimony linking weathered gasoline to the Kilgore tanks was Mr. Molnar's testimony that when the Kilgore tanks were excavated, he was

11. The term "weathered gasoline" refers to gasoline which has come into contact with soil or water and as a result has undergone some change in its chemical composition.

present and detected the odor of weathered gasoline. R.R. at 142a. Mr. Molnar testified to smelling the same odor of weathered gasoline in the well water supplying appellants' home. R.R. at 167a. The second expert witness called by the appellants, chemist Mr. Richard Underwood, testified that the chemicals existing in the appellants' well water and in the residue remaining in the Kilgore tanks upon excavation are considered hazardous substances. R.R. at 213a and 215a.

Based upon the evidence presented, the trial court correctly entered a directed verdict in favor of McCleary Oil. As the trial court correctly stated:

> ... what the Flecks experienced is weathered gasoline and the smell of gasoline ... How the gasoline got there, the jury is going to have to decide, but McClearys only delivered kerosene to the Kilgore tanks ... the Court after reviewing can find no evidence of causation from the testimony presented ... that McCleary Oil Company Inc., (sic) pumping of kerosene into the Kilgore tanks caused the gasoline to appear in the Fleck's well ...

R.R. at 225a–227a. Simply stated, appellants in the instant case failed to produce any evidence, through the use of expert witnesses, to establish that the act of pumping kerosene in the Kilgore tanks could have caused the appellants' well water to become polluted with weathered gasoline. Without any evidence to support a finding of legal causation, McCleary Oil could not be found liable for the damages sustained by appellants. Hence, the directed verdict in this case will not be disturbed on appeal.

■ Finally, we must determine whether the trial court erred in limiting the scope of the testimony of Mr. Molnar. "The question of whether a particular witness qualifies as an expert is a matter for the trial judge ... and his decision in this matter will be reversed only for a clear abuse of discretion." *Marlowe v. Lehigh Township*, 64 Pa.Commn. 587, 441 A.2d 497, 499 (1982). Mr. Molnar's educational background included "a bachelor's degree in geology ...

and considerable post graduate training." R.R. at 110a.
When asked whether he had studied chemistry in college,
Mr. Molnar stated that he had taken "basic chemistry" and
that his geology courses involved some particular types of
chemistry. R.R. at 116a. In his position as a hydrogeolo-
gist with the DER, Mr. Molnar testified that his duties
consist of "protection of the ground water in a 14 county
area of Pennsylvania surrounding Harrisburg. This in-
cludes everything from review of permits for disposal of
sewage and industrial waste to the investigation of ground
water contamination..." R.R. at 110a. Mr. Molnar testi-
fied that in his job with the DER, he was responsible for
determining "the geological structure and how it influences
the movement of ground water" and that the DER chemical
laboratory "determines what particular substances are in
the water. It's then up to me to interpret them in terms of
my knowledge of the chemistry of various products." R.R.
at 111a–112a. The trial court permitted Mr. Molnar to
testify concerning his opinion that, based on the geological
characteristics of the land surrounding appellants' home,
the source of their well water pollution was at least one of
appellees' seven underground storage tanks. Mr. Molnar
was also permitted to testify concerning the DER's chemi-
cal test results. However, the trial court did not find that
Mr. Molnar was qualified to testify as an expert concerning
the chemical decomposition of kerosene or of gasoline which
occurs when these chemical substances move through the
ground. The trial court, in its Opinion, states the following:

> Though Molnar had some background in chemistry inci-
> dental to his training as a hydrogeologist, plaintiff of-
> fered him to testify as to the specific chemical compo-
> nents of kerosene as it decomposes while travelling
> through the ground. The court found that this was a
> highly technical area of chemistry beyond the knowledge
> of Molnar's training. As such, the court rules that Mol-
> nar could only testify, generally, that the components of
> kerosene change as they filter through the ground.
> A review of Molnar's deposition testimony reveals the
> limited nature of his knowledge of chemistry. In his

deposition, Molnar posited that the kerosene in defendants' tanks may have pushed gasoline into the ground, but then he admitted that he was unsure whether kerosene was heavier or lighter than gasoline.

Op. of Trial Court at 4.

We find that the trial court did not abuse its discretion in limiting the scope of the testimony of Mr. Molnar. Appellants presented no foundation for showing that Mr. Molnar had the ability to testify as an expert concerning the specific issue of chemical changes which may occur in gasoline or kerosene due to contact with soil and ground water. While this subject certainly called for expert testimony, Mr. Molnar did not present any evidence of his ability to give it. As this Court aptly recognized in *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 43, 485 A.2d 408, 418 (1984) "... it may appear that the scope of the witness's experience and education may embrace the subject in a general way, but the subject may be so specialized that even so, the witness will not be qualified to testify." In *Dambacher*, this Court held that the trial court had abused its discretion in permitting a proffered expert witness to express the opinion that the mixing of radial and nonradial tires had been the cause of an auto accident where the witness, while experienced in the subject of auto tires in a general way, did not have any specialized knowledge or experience concerning the subject of mixing radial and nonradial tires. *See also First Methodist Episcopal Church v. Bangor Gas Company*, 388 Pa. 115, 130 A.2d 517 (1957) (Oil burner repairman, who had no knowledge of gas or gas burning devices, and chemistry teacher, who had engaged in fuel analysis but was not a combustion engineer, were not qualified to give their opinion on the cause of an explosion in oil furnace.); *Erschen v. Pennsylvania Independent Oil Company*, 259 Pa.Super. 474, 393 A.2d 924 (1978) (In action for negligence in the installation of gasoline tanks, trial court properly ruled that trooper; who had no formal instruction or on-the-job training in the origin of gas explosions, could not testify as an expert notwithstanding the trooper's qualifications as a fire

marshal.) In the instant case, the trial court correctly determined that Mr. Molnar did not have the necessary knowledge or experience to provide the jury with testimony concerning complex chemical information. As a result, any attempt on the part of Mr. Molnar to so testify could not have aided the jury in their "search for truth." *Dambacher, supra,* 336 Pa.Super. at 36, 485 A.2d at 415.

For all of the foregoing reasons, our decision is to affirm the trial court.

Order affirmed.