## Lombardo v. Gardner

C.P. of Lawrence County, no. 10102 of 2002, C.A.

*Peter M. Villari* and *Paul D. Brandes,* for plaintiff.
*M. Brian O'Conner,* for defendant.

MOTTO, *P.J.,* May 21, 2007—Before the court for disposition are the respective motions of plaintiff Eleanor Lombardo and defendant Stewart Gardner M.D. for post-trial relief following a jury verdict in favor of plaintiff and against defendant on a claim of negligent medical care provided to plaintiff by Dr. Gardner in May 2001, after right total hip replacement surgery performed at Jameson Memorial Hospital.

Plaintiff commenced this action to recover damages for injuries sustained because of the failure of Dr. Gardner and the employees of Jameson Hospital to diagnose an arterial clot in her leg for six days following right total hip replacement surgery performed by Dr. Gardner on May 9, 2001. Due to defendant's post-operative negligence in failing to diagnose and treat a growing arterial occlusion in Mrs. Lombardo's right leg, she suffered ongoing restricted and diminished blood flow to her right lower leg (ischemia), with resulting progressive tissue and nerve damage, and, ultimately, was forced to undergo amputation of her right lower leg.

In 2002, Mrs. Lombardo instituted this lawsuit against Dr. Gardner, Jameson Memorial Hospital and four of its nurses. Defendant, Dr. Gardner, filed an answer to the

complaint. However, he never filed a new matter, cross-claim or third-party complaint.

During the course of litigation, plaintiff served various interrogatories and document requests on defendant, Dr. Gardner, seeking, among other things, disclosure of his own applicable opinions regarding the care and injuries at issue, as well as the names of expert witnesses and their opinions, which he planned to offer at the time of trial. Defendant offered sworn answers to interrogatories regarding his own opinions and produced expert reports by Paul Liefeld M.D., an orthopedic surgeon, and Satish Muluk M.D., a vascular surgeon.

Dr. Gardner and his experts were not critical of any care provided to Mrs. Lombardo by another defendant or a non-party, and no contention was made by them that Mrs. Lombardo was somehow negligent or assumed the risk. Dr. Gardner never alleged that Mrs. Lombardo's injuries and disability were caused by any actions or inactions of any nurse or other care provider. Rather, Dr. Gardner opined under oath in his answers to interrogatories (read to the jury) that Mrs. Lombardo's injuries and disability were not caused nor contributed to by the negligence of any other person, Mrs. Lombardo was not comparatively at fault nor did she assume the risk, and that her injuries and disability were related solely to her "sustain[ing] a compression injury to the artery closest to the hip joint resulting in the formation of a clot which caused the blockage of the vessel." N.T. 10/26/06, at 164:3-11; 165:25-166:6; 166:716.

In defendant's pretrial statement, Dr. Gardner listed only Drs. Liefeld and Muluk as experts who would testify at trial in support of the defense. Dr. Gardner did not offer himself as an expert witness on standards of care,

including nursing care, via his pretrial statement nor via any proffer during trial nor via any question posed to him during trial.

Immediately before trial began, four nurses were voluntarily dismissed from the case by stipulation of all parties and the court was advised that plaintiff had given Jameson Memorial Hospital and Jameson Health Systems Inc. (collectively, the Hospital) a joint tort-feasors release. Counsel for Dr. Gardner then moved to amend his answer to plead the benefit of that release and to retain the Hospital as a party so that their negligence, if any, could be determined with that of Dr. Gardner. That motion was denied and the Hospital was excused from further participation in the case. Dr. Gardner orally moved for leave of court to (a) file a cross claim against the Hospital to pursue the Hospital's vicarious liability for what Dr. Gardner wanted to claim was the causal negligence specifically of the four hospital nurses, and (b) file a new matter against plaintiff to plead the release. N.T. 10/23/06, at 2:11-3:1. Dr. Gardner further sought to compel plaintiff's vascular surgery expert, James Salander M.D., to testify in support of defendant's hoped-for claim against the Hospital. *Id.* Given that defendant did not have his own expert witnesses to support such a claim, he could not make out a prima facie case against the Hospital without forcing plaintiff's experts to testify on his behalf. Plaintiff opposed Dr. Gardner's oral motions and supported dismissal of the Hospital. The court granted the motion of the Hospital and denied the motions of Dr. Gardner.

The trial started with jury selection and opening statements on October 23, 2006. Plaintiff presented her expert witnesses, lay witnesses and medical fact witnesses in

the days thereafter. At no time did defendant object to the qualification or expertise of any of plaintiff's experts, nor did defendant object to the areas of testimony of any of plaintiff's experts. See N.T. 10/24/06, at 75:13-156:12 (David Smith M.D., orthopedic surgeon); 158:1-250:3 (James Salander M.D., vascular surgeon); 251:2-285:8 (Jody Masterson, life care planner).

During trial, Dr. Salander criticized Dr. Gardner for not having included an arterial clot in his differential diagnosis and thus not having tested for this possibility. When cross-examined about his ability to testify as to the standard of care of an orthopedic surgeon, Dr. Salander explained that the need to make such a diagnosis is an area in which orthopedic surgery and vascular surgery overlap.

On October 26, 2006, defendant called Dr. Muluk out of turn to accommodate the doctor's schedule to testify as an expert in defendant's case in chief. Thinking the defendant might attempt to elicit orthopedic standard of care opinions from his vascular surgery expert, immediately before the expert took the witness stand plaintiff orally made a motion to the court in chambers. Plaintiff's motion to limit the expert's testimony was based on the expert's qualifications specified in his curriculum vitae and the fact that the defendant was still going to produce an orthopedic surgery expert to testify to the standard of care issues. Per the doctor's curriculum vitae, it was apparent his field of expertise was in vascular surgery.

Defendant's basis for claiming that Dr. Muluk should be permitted to testify to an orthopedic standard of care was a contention that Dr. Muluk's vascular surgery expertise generally overlapped with that of an orthopedic surgeon. The matter at issue was an orthopedic surgeon's

thought processes and proficiency in diagnosing an allegedly "subtle" vascular injury or compromise. Defendant alleged that Dr. Muluk should be allowed to explain that Dr. Gardner's orthopedic thought processes in diagnosing Mrs. Lombardo's signs and symptoms, and Dr. Gardner's failure to timely diagnose the vascular injury, were reasonable. However, this court found that there was no factual basis cited by defendant to support the claim concerning Dr. Muluk's purported overlap of expertise.

Additionally, during Dr. Muluk's testimony, he testified concerning the cause of Mrs. Lombardo's injuries and the impact of care received by her after her arterial occlusion was finally diagnosed. Based on this testimony, there was allegedly no damage to Mrs. Lombardo's leg before May 15 or 16. Dr. Muluk also testified to causation issues elicited by defendant. He testified to what Mrs. Lombardo's injuries were related, how much time could be allowed to pass from diagnosis of the occlusion to resolution of the occlusion before permanent damage could occur to the leg, how the time lag from diagnosis to surgical resolution of the occlusion and treatment of its aftermath affected Mrs. Lombardo's outcome, and how the care Mrs. Lombardo received at the University of Pittsburgh Medical Center impacted her outcome.

Defendant is arguing in his post-trial motions that Dr. Muluk was prevented from testifying about whether the same corrective procedure would have been required if the diagnosis of the clot had been made on May 9 or May 10, and about whether the failure to diagnose it before May 15 complicated the surgery.

On October 30, 2006, the jury entered its verdict, finding Dr. Gardner causally negligent and awarding dam-

ages in the total amount of $2,794,000, which included $50,000 for past and future lost earnings and earning capacity, $744,000 for past and future medial expenses and life care expenses, and $2,000,000 for past, present and future pain and suffering, embarrassment, humiliation, loss of the enjoyment of life and disfigurement. Dr. Gardner thereafter filed a post-trial motion requesting a new trial, or, in the alternative, a remittitur in accordance with Pa.R.C.P. 1042.72 and 40 P.S. §1303.515. The issues to be decided are as follows:

I. Was Dr. Gardner entitled to have defendants Jameson Memorial Hospital and Jameson Health Systems Inc., retained as defendants after they had entered into a joint tort-feasor release with plaintiff?

II. Was Dr. Muluk, a vascular surgeon, qualified to testify concerning the standard of care applicable to Dr. Gardner, an orthopedic surgeon?

III. Should defendant's vascular surgery expert have been permitted to testify that negligence in not diagnosing a clot prior to May 15 could not have increased plaintiff's risk of harm, and did not complicate the ensuing vascular surgeries to plaintiff's leg?

IV. Was the jury's verdict on pain and suffering damages clearly excessive and not supported by the evidence, thus requiring remittittur?

When considering a motion for new trial, the decision whether to grant or deny a new trial lies within the discretion of the trial court. As long as there is a basis on the record to support the ruling of the trial court, the court's decision will not be reversed. Any conflicts in the evidence at issue must be resolved in favor of Mrs. Lombardo, the winner at trial of the issues now raised by

240

defendant. *Poleri v. Salkind,* 453 Pa. Super. 159, 683 A.2d 649 (1996). When reviewing a decision to grant or deny a direct verdict, the court "must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner." *Goldberg v. Isdaner,* 780 A.2d 654, 659 (Pa. Super. 2001). Only where there is an abuse of discretion or an error of law should a verdict be reversed. See *Fleck v. Timmons,* 374 Pa. Super. 417, 426-27, 543 A.2d 148, 153 (1988).

Dr. Gardner asserts that he was entitled to have defendants Jameson Memorial Hospital and Jameson Health Systems Inc. retained as defendants after they had entered into a joint tort-feasor release with plaintiff.

In seeking apportionment of liability or contribution among alleged joint tort-feasors, the burden of proving the joint causal negligence and the degree of apportionment or contribution among the alleged joint tort-feasors rests with the defendant. *Wade v. S.J. Groves & Sons Company,* 283 Pa. Super. 464, 424 A.2d 902 (1981). Accordingly, for defendant to establish a prima facie case in furtherance of his desired new claim against the hospital nurses, he would have been required to prove at trial that (1) the nurses owed a duty to Mrs. Lombardo, (2) the nurses breached that duty, (3) the breach was a proximate cause of, or a substantial factor in, bringing about the harm suffered by Mrs. Lombardo, and (4) the damages suffered by her were a direct result of the harm. *Poleri, supra* at 167, 683 A.2d at 653; *Grossman v. Barke,* 868 A.2d 561, 566 (Pa. Super. 2005).

The party with the burden of proof in a medical malpractice case, here the defendant asking for the Hospital to be joined as additional defendants, must establish all four of the elements via his own expert; that is, he must

"establish through expert testimony that . . . [the nurses'] acts deviated from an accepted standard of care and that the deviation was a substantial factor in causing plaintiff's harm." *Grossman, supra,* 868 A.2d at 567; *Hightower-Warren v. Silk,* 548 Pa. 459, 698 A.2d 52, 54 (1997); *Toogood v. Rogal,* 573 Pa. 245, 261, 824 A.2d 1140, 1149 (2003). If the party with the burden of proof cannot establish each of the four elements through the facts and his expert's testimony, the claim is legally insufficient and must be dismissed as a matter of law.

In the case at bar, Dr. Gardner did not have any evidence to establish in his case in chief that the nurses breached any duty owed to Mrs. Lombardo, that any alleged breach brought about her harm and that her damages were a direct result of the harm occasioned by the nurses. Moreover, the plaintiff was not presenting any case against the nurses. Therefore, any evidence concerning alleged culpability of the nurses was irrelevant because nursing negligence was not an issue of consequence in the case.

This court found that (a) Dr. Gardner never proffered any expert report or opinion critical of the Hospital or its nurses; (b) defendant never filed a cross claim (not even one contending another party's causal neglect or seeking an apportionment of liability among defendants); and (c) defendant never filed a new matter. The decision to grant or deny leave to amend is within the sound discretion of the trial court, and will not be reversed absent a clear abuse of discretion. *Junk v. East End Fire Department,* 262 Pa. Super. 473, 490, 396 A.2d 1269, 1277 (1978). Since Dr. Gardner could not establish a negligence claim against the hospital nurse, the court denied his motion for leave to amend his answer to the complaint

to include a new matter and cross claim. Any such claim would be legally insufficient as a matter of law. When a claim is legally insufficient, it may not go to the jury and must be dismissed. See Pa.R.C.P. 1028(a)(4). Where the prima facie elements of a claim will not be established, the right to amend a pleading to assert such a claim is properly withheld. *Spain v. Vicente,* 315 Pa. Super. 135, 142-43, 461 A.2d 833, 837 (1983); *Behrend v. Yellow Cab Company,* 441 Pa. 105, 110, 271 A.2d 241, 243 (1970).

After this court denied the defendant's motion to amend his pleadings, Dr. Gardner sought to compel plaintiff's vascular surgery expert to testify on his behalf concerning nursing standards of care and issues of causation. The defendant wanted the plaintiff's expert to discuss the nursing issue on cross-examination during plaintiff's case in chief. Since defendant had no witnesses to support his new claim concerning the alleged culpability of the nurses, his hope was to force plaintiff's expert to support the elements that would have made up defendant's burden of proof had he been permitted to proceed with his claim. This was improper as a matter of law.

It is well established in Pennsylvania that an expert witness cannot be compelled to testify as to his opinion against his will. *Jistarri v. Nappi,* 378 Pa. Super. 583, 595, 549 A.2d 210, 216 (1988). The private litigant has no more right to compel a citizen to give up the product of his brain, than he has to compel the giving up of material things. *Pennsylvania Company for Insurances on Lives and Granting Annuities v. Philadelphia,* 262 Pa. 439, 442, 105 A. 630 (1918). A party may not even subpoena the testimony of an expert for another party. *Spino*

*v. John S. Tilley Ladder Co.,* 448 Pa. Super. 327, 353, 671 A.2d 726, 739 (1996), *affirmed,* 548 Pa. 286, 696 A.2d 1169 (1997). Nor may one party utilize the expert report of another party. *Columbia Gas Transmission Corp. v. Piper,* 150 Pa. Commw. 404, 409, 615 A.2d 979, 982-83 (1992). The basis for this rule is an acknowledgement of an expert's proprietary interest in his own opinion, and the recognition that he should not be required to relinquish it without his consent. *Evans v. Otis Elevator Co.,* 403 Pa. 13, 27, 168 A.2d 573, 580 (1961); *Pascone v. Thomas Jefferson University,* 357 Pa. Super. 524, 516 A.2d 384 (1986).

In arguing that defendant was entitled to have the Hospital and nurses retained as defendants after they had entered into a joint tort-feasor release, the plaintiff relies on *Herbert v. Parkview Hospital,* 854 A.2d 1285 (Pa. Super. 2004). In *Herbert,* administratrix of a deceased patient's estate filed a medical malpractice action against a hospital and three physicians, alleging that the physicians failed to find an obstruction in the patient's airway, leading to his death. Before the trial began, one doctor was released from the case and administratrix entered into a joint tort-feasor release agreement with all remaining defendants except one doctor. The trial court included the names of the released defendants on the verdict sheet, thus allowing the jury to apportion liability to those defendants who had settled with administratrix. The jury returned a verdict for the plaintiff. The plaintiff then filed post-trial motions claiming the trial court erred in including the names of the parties to the release on the jury verdict sheet.

The issue in *Herbert* was whether or not released defendants should have been included on the verdict

sheet given the evidence actually submitted to the jury. Unlike the case before this court, the issue was not whether the remaining defendant could legally make out a claim for apportionment of liability against those defendants. Additionally, it was the plaintiff on appeal who asserted error in including the released defendants on the verdict sheet and as such, the record had to be viewed in the light most favorable to the defendant on that issue. The Superior Court ruled that where no evidence of the released defendant's alleged causal neglect will be presented at trial, it is improper to include it on the verdict sheet. Furthermore, in *Herbert,* the released doctor was found properly included on the verdict sheet because the plaintiff's physician expert during plaintiff's case in chief, voluntarily implicated the neglect of the released defendant-doctor. In the case before this court, there was no evidence presented by plaintiff's witnesses during their case in chief that would implicate the released defendants.

The defendant in his brief also cites the case of *Davis v. Miller,* 385 Pa. 348, 123 A.2d 422 (1956). In *Davis,* the issue was apportionment of liability among motor vehicle drivers in a simple motor vehicle negligence claim. 385 Pa. at 349, 123 A.2d at 423. No expert testimony was required in such a matter, as the jury could understand the driver negligence issues on its own. The Supreme Court determined it was an error not to have the jury apportion liability among the released defendant and the remaining defendant because sufficient, competent evidence concerning the released defendant was inevitably going to be presented to the jury simply by virtue of testimony concerning the circumstances of the accident.

In the case before this court, no inculpatory testimony on nursing standards of care was going to be introduced in plaintiff's case in chief. No witness was going to cover the issue. The door was not going to be opened by the plaintiff. Based on that representation prior to the start of the testimony, plus the fact the defendant had no such evidence to present, this court correctly denied the defendant's motion. The plaintiff's vascular surgery expert never testified concerning the nursing standard of care, nor about any breach in a standard of care by the nurses, and not about any harm relating to any act or omission of any nurse. The testimony of Dr. Salander covered the medical diagnosis of vascular occlusion, and how failure to timely diagnose can lead to and ultimately did result in Mrs. Lombardo's injuries. This testimony covered areas particular to doctors, not nurses.

This court is mindful of the rule expressed and applied by the courts of this Commonwealth that one party may not compel an expert for the opposing party to divulge his expert opinion. Thus, one party may not subpoena the testimony of an expert for another party. *Spino v. John S. Tilley Ladder Co.,* 448 Pa. Super. 327, 353-54, 671 A.2d 726, 739 (1996), *aff'd,* 548 Pa. 286, 696 A.2d 1169 (1997). Nor may one party utilize the expert report of another party. *Columbia Gas Transmission Corp. v. Piper,* 150 Pa. Commw. 404, 409, 615 A.2d 979, 982-83 (1992). The basis for this rule is an acknowledgement of an expert's proprietary interest in his own opinion, and the recognition that he should not be required to relinquish it without his consent. The private litigant has no more right to compel a citizen to give up the product of his brain than he has to compel the giving up of material things. *Id.* at 409, 615 A.2d at 982.

While the defendant now argues that it was an error for this court not to permit him to establish a prima facie case against the nurses by reference to Dr. Salander's report, the fact remains that Dr. Salander is not a nurse and it would be up to the defendant to present a nursing expert to testify to nursing standards of care. The report itself was irrelevant, hearsay and inadmissible. *Pompa v. Hojnacki,* 445 Pa. 42, 281 A.2d 886 (1971); Pa.R.E. 402. Since Dr. Salander did not testify to issues or nursing culpability, the nursing issue remained irrelevant to the case being presented by plaintiff and the expert could not be cross-examined with the report to demonstrate a prior inconsistent statement. Because there was no statement made in the trial testimony, there could be no prior inconsistent statement.

Finally, as to defendant's assertion that he should have been permitted to testify as an expert on his own behalf with respect to nursing standards of care, the fact remains that issues not raised during the trial are waived with regard to post-trial motions. Pa.R.E. 103; *Adamsky v. Picknick,* 412 Pa. Super. 544, 548, 603 A.2d 1069, 1071 (1992); *Connelly v. Roper Corporation,* 404 Pa. Super. 67, 71, 590 A.2d 11, 13-14 (1991). In order to preserve an issue for review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. *Hong v. Pelagatti,* 765 A.2d 1117, 1123 (Pa. Super. 2000). Nowhere in the record is that issue preserved, therefore, the matter cannot serve as a basis to award a new trial or alter the jury verdict.

The second issue to be decided is whether this court correctly granted plaintiff's motion to preclude defen-

dant's vascular surgery expert from testifying to the standard of care of an orthopedist.

Defendant contends this court erred in precluding his vascular surgery expert, Dr. Muluk, from testifying to standards of care applicable to orthopedists. In support of his allegation, defendant cites 40 Pa.C.S. §1303.512(e) of the MCARE Act, and contends that this court erroneously interpreted and applied the cited subsection.

The MCARE Act provision concerning qualifications of expert witnesses is contained in 40 P.S. §1303.512. While section 1303.512(c) states the general rule that testimony concerning the standard of care of a board certified specialist is to come from a physician who is board certified in the same specialty, that restriction is subject to the exception contained in section 1303.512(e) The relevant portions of the MCARE Act state:

"Section 1303.512(c) *Standard of care.*—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

"(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

"(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

"(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

"Section 1303.512(e) *Otherwise adequate training, experience and knowledge.*—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period." 40 P.S. §1303.512.

The application of section 1303.512(e) to the qualifications of a particular expert's qualifications is a question of law for which a review is plenary. Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. *Weiner v. Fisher,* 871 A.2d 1283, 1285 (Pa. Super. 2005). The issue regarding an expert's qualifications under the MCARE Act is a question of statutory interpretation.

Defendant asserts that this court was in error for not waiving the same specialty and board certification requirements as it pertains to the defense vascular surgery expert, Dr. Muluk. Since the ruling by this court occurred before the doctor took the witness stand and the defendant never sought to place before the court actual testimony of Dr. Muluk, the record must be viewed in light of what was available to the court at the time of its ruling. See Pa.R.E. 103(2). The only evidence about Dr. Muluk's qualifications was his curriculum vitae and the arguments of counsel. The curriculum vitae provided that the doctor had education, training, knowledge and experience solely in the area of vascular surgery. Nowhere in the doctor's resume did it indicate any expertise in orthope-

dics. Based on the record presented, this court was well within its discretion in not waiving the same specialty and board certification requirements.

Furthermore, even if the court had waived the "same specialty and board certification" requirements of section 1303.512(c)(2), the defendant still had the burden to prove that Dr. Muluk satisfied section 1303.512(c)(1), in that he was "substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care." Subsection (e) of section 1303.512 of the Act does not allow for waiver of this portion of subsection section 1303.512(c). The defendant did not establish that Dr. Muluk was substantially familiar with the standard of care for the "specific care at issue," which is that of an orthopedist timely and properly evaluating the signs and symptoms of an orthopedics patient, then making a differential diagnosis and a final diagnosis of a blood clot in an artery after orthopedic hip replacement surgery. The testimony cited by the defendant at page 8 of his brief does not support the assertion that Dr. Muluk possesses specialized knowledge regarding orthopedic standards of care. The fact that a vascular surgeon has familiarity with the significance of circulatory signs and symptoms and the fact that he is called in at times by orthopedists to consult on or treat post-operative patients who have vascular conditions does not prove that Dr. Muluk is specially knowledgeable regarding how orthopedists are expected or supposed to think about patients after orthopedic surgery.

This case centered on the failure of an orthopedist to consider and include arterial occlusion in his differential diagnosis based on plaintiff's signs and symptoms, and

then to actually diagnosis the condition, as opposed to a failure to properly treat a condition that was correctly diagnosed. Accordingly, while the standard of care regarding how to treat an already diagnosed vascular condition may be similar between vascular surgeons and orthopedists, the same cannot be said concerning how orthopedists think through the significance of their patients' signs and symptoms in an effort to arrive at a diagnosis. Therefore, this court was correct in its ruling not permitting Dr. Muluk to testify to orthopedic standards of care.

The third issue to be decided by this court is whether defendant should have been permitted to develop the assertion through Dr. Muluk that an earlier diagnosis of plaintiff's clot would not have decreased Mrs. Lombardo's risk of harm.

Defendant contends that, although Dr. Muluk testified that Mrs. Lombardo did not suffer any damage to her leg between May 9 and May 15 and that there was no reason to operate on it until May 15, defendant was prevented from fully developing this issue, with the court sustaining objections to questions about whether the same procedure would have been required if the diagnosis of a clot had been made on May 9 or May 10 and about whether the failure to diagnose it before May 15 complicated the surgery. (Tr. Oct. 26 at 24-25, 48, 52 and 58-59.)

Dr. Muluk was allowed to freely speak to the physiology of what occurred to plaintiff and how the injury to the leg was brought about. The ruling of the court went only to preventing Dr. Muluk from giving expert opinion relative matters for which he was not qualified as an expert, *i.e.,* standard of care of an orthopedic surgeon,

or that the cause of the harm to plaintiff was the result of the negligence of other doctors or health care providers not named in the lawsuit, or opinions that were not within the scope of his expert report. Dr. Muluk was not precluded from explaining the physiology of what caused the harm to plaintiff. (Tr. Oct. 26, at p. 51.)

The Pennsylvania Supreme Court held in *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978), that "once the jury is apprised of the likelihood that defendant's conduct resulted in plaintiff's harm, that section [Restatement (Second) of Torts §323(a)] leaves to the jury, and not the medical expert, the task of balancing probabilities." *Id.* at 273, 392 A.2d at 1286.

Dr. Muluk testified that regardless of Mrs. Lombardo's signs and symptoms before the morning of May 15, there was no cause or justification to operate on her. It was only when there was no pulse found in her foot on May 15, according to Dr. Muluk, the proverbial clock started running. Consequently, the jury could have inferred that any negligence up to that point was irrelevant and any failure to operate before May 15 could not have complicated the surgery performed on May 15 because, according to Dr. Muluk, no surgery was even required before May 15. This was all common sense and capable of being understood by the jurors, who are reasonably expected to apply their own training, knowledge, intelligence and experience to the evidence presented to them. *Collins v. Zediker,* 421 Pa. 52, 53, 218 A.2d 776, 777 (1966); and *Kent v. General Chemical Co.,* 285 Pa. 34, 37, 131 A. 588, 589 (1925) (ruling that where facts concerning causation issues are testified to "with sufficient clearness and definiteness" that a layperson could understand them or draw inferences from them, the jury is

permitted to apply their collective knowledge and common sense to independently evaluate the evidence without the need for expert testimony). Therefore, the court finds that the defendant suffered no prejudice by virtue of the court sustaining the objections because the defendant submitted the issues via his expert for the jury's consideration despite this court's ruling that precluded testimony from Dr. Muluk as to opinions on standard of care for which he was not qualified as an expert or as to opinions not included in his expert report.

As to the question to Dr. Muluk regarding whether failure to diagnose the blood clot increased the risk of harm to plaintiff, there was no factual basis developed to allow for an opinion on that question, nor was that issue addressed in the expert report of Dr. Muluk. Therefore, the court properly sustained the objection to that question.

The fourth issue to be decided is whether the defendant is entitled to remittitur of the jury's pain and suffering verdict and whether an evidentiary hearing is required before ruling on the defendant's request.

The defendant seeks a remittitur of the jury's award of noneconomic damages, claiming that the award was excessive under the law. The defendant relies on the MCARE Act, 40 Pa.C.S. §1303.515, but must also comply with Pa.R.C.P. 1042.72.

Rule of Civil Procedure 1042.72(b) and the comment thereto mandate that the defendant has the burden of proof to show the damage award "deviates substantially from what could be reasonable compensation." Subsection (b) further mandates that included in the evidentiary assessment is (1) evidence supporting plaintiff's claim, (2) factors that should have been taken into ac-

count in making the award, and (3) whether the award, when assessed against the evidentiary record, "strongly suggests" the jury was influenced by passion or prejudice. Notwithstanding the mandate of this rule, the defendant has not come forth with any evidence to support his claim. Additionally, section 515(a) of the MCARE Act requires the defendant to produce sufficient evidence so the trial court can "consider evidence of the impact, if any, upon availability or access to heath care in the community if the defendant health care provider is required to satisfy the verdict rendered by the jury." The defendant in this case has not produced any such evidence. The defendant, in fact, conceded throughout the trial that the plaintiff's pain, suffering, loss of life's pleasures and the like were tremendous.

"In reviewing the award of damages . . . courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence." *Ferrer v. Trustees of University of Pennsylvania,* 573 Pa. 310, 825 A.2d 591, 611 (2002). The large size of a verdict by itself is not evidence of excessiveness. *Layman v. Doernte,* 405 Pa. 355, 175 A.2d 530 (1961). The note in subsection (b) of Rule 1042.72 states that "the factors that the trier of fact should take into account in making an award of noneconomic damages are those set forth in the jury instructions described in Rule 223.3." Rule 223.3 indicates that damages for past and future noneconomic loss consist of four items: (1) pain and suffering; (2) embarrassment and humiliation; (3) loss of ability to enjoy the pleasures of life; and (4) disfigurement. Mrs. Lombardo presented evidence for each of these items of damages, including: the actual loss of her leg, the jury's opportunity to see her each day in court,

the pictures of her injuries, the pictures of her in pain during wound debridements, and the testimony of relatives that they heard and watched her holler in pain during wound debridements. The facts presented to the jury fully support its verdict.

In *McManamon v. Washko,* 906 A.2d 1259 (Pa. Super. 2006), the Pennsylvania Superior Court affirmed an award of $10,000,000 for noneconomic damages for an accident victim who suffered multiple fractures and a brain injury resulting in cognitive deficits. The facts and circumstances cited by the Superior Court in *McManamon* are virtually identical to the facts and circumstances presented to the jury concerning Mrs. Lombardo. Each of those facts on damages were uncontested by the defendant. In *Carrozza v. Greenbaum,* 866 A.2d 369 (Pa. Super. 2004), the court affirmed an award of $4,000,000 after defendant's failure to timely diagnose breast cancer led to a mastectomy, chemotherapy and radiation treatments, and associated disfigurement. *Potochnick v. Perry,* 861 A.2d 277 (Pa. Super. 2004) (affirming award of $10,000,000 to accident victim who suffered a fracture and a closed head injury resulting in cognitive deficits).

With respect to the total verdict, 40 P.S. §1303.515 requires the court to consider "the impact, if any, upon availability or access to health care in the community if the defendant health care provider is required to satisfy the verdict rendered by the jury" and to "specifically set forth the factors and evidence it considered." The defendant submitted no evidence to this court that his business or the community would suffer great harm if the jury award is affirmed. The defendant has not provided the court with any actual facts or verification of facts for consideration. Therefore, the court is going to affirm the

jury award because the defendant has not come forth with any evidence to support his claim.

Although the plaintiff was the verdict winner in this case, the plaintiff also filed a motion for post-trial relief contending that the court erred in denying plaintiff's motion for directed verdict since the defense expert agreed that the defendant violated the standard of care and that the defendant's negligence resulted in some harm to the plaintiff.

The law in this Commonwealth is clear: once plaintiff establishes as a matter of admitted fact the issue of negligence, and that the negligence brought about at least some objectively verifiable harm, plaintiff is entitled to judgment as a matter of law on those issues. *Andrews v. Jackson,* 800 A.2d 959, 962 (Pa. Super. 2002) (where the experts agreed the accidents caused some injury, but the jury found to the contrary, that finding was determined to have contradicted all the evidence of the medical experts. A new trial on damages was warranted because such a verdict bears no rational relation to the evidence adduced at trial). The court finds that this case was properly submitted to the jury to determine both negligence and causation issues. Accordingly, the court will enter an order of even date which will deny both the defendant's and plaintiff's post-verdict motions.

## ORDER

And now, May 21, 2007, for the reasons set forth in the accompanying opinion of even date herewith, it is ordered, adjudged and decreed that the motion of defendant Stewart Gardner M.D. for post-trial relief and plaintiff Eleanor Lombardo's cross-motion for post-trial relief in the alternative are each denied.